**Don A. ELLIS, Plaintiff,**

v.

**BELL AEROSPACE CORPORATION, a Delaware corporation, dba Bell Helicopter Company, Defendant.**

**Civ. No. 68-450.**

United States District Court, D. Oregon.

March 27, 1970.

Davies, Biggs, Strayer, Stoel & Boley, Portland, Or., for plaintiff.

McColloch, Dezendorf, Spears & Lubersky, Portland, Or., for defendant.

## OPINION

ALFRED T. GOODWIN, District Judge.

Don Ellis paid Bell Aerospace Corporation $102,110 for a new helicopter. The helicopter was substantially destroyed while Ellis and a Bell flight instructor were taking the first of five training flights that were contemplated in the purchase agreement. Ellis brings this action to recover the purchase price.

Relying on the Uniform Commercial Code, ORS 72.5090(3), Ellis contends that at the time of the crash Bell bore the risk of loss because Ellis had not received the helicopter. He also contends that the sole proximate cause of the crash was the negligence of the Bell flight instructor.

Bell contends that the risk of loss had passed to Ellis, and that the sole proximate cause of the crash was the negligence of Ellis.

The relevant documents conflict with the conduct of the parties. Prior to the crash each party exerted some control over the helicopter. Each party also recognized that the other had an interest in the helicopter. The documents tend to favor Bell; the conduct favors Ellis.

To the extent that the material facts have not been agreed upon, I find the facts as follows:

During the year 1967, Bell enjoyed a greater demand for JetRanger Helicopters than it could immediately satisfy. Bell's policy was to fill orders in the sequence in which they were received.

Ellis decided in September 1967 to purchase a JetRanger Model 206A helicopter. Bell's regional sales manager in Portland told Ellis of an order which had been placed in January 1967 by a customer who was willing to stand aside. Bell sales representatives then arranged for the January order to be "assigned" to Ellis, although the priority document on its face was "nonassignable."

From September 1967 until January 1968, the documents exchanged between Bell and Ellis treat the transaction as an assignment to Ellis of all rights under a purchase order made by another customer. Ellis, however, never saw the purchase order until after this litigation arose.

Ellis reimbursed the earlier customer $11,000 which the customer had paid Bell. On January 19, 1968, Ellis paid Bell the $91,110 remaining to be paid before delivery.

On January 20, 1968, Ellis obtained a Lloyd's insurance policy which protected him only against liability for personal injury and property damage. On March 8, 1968, an endorsement attached to this policy deleted an older model helicopter which Ellis owned and, effective March 10, 1968, added the Bell JetRanger. Ellis did not obtain hull-damage insurance for the helicopter, but he could have. He had paid the purchase price and had registered the helicopter in his name with the Federal Aviation Agency. He thought of himself as the owner of the new helicopter on or about March 8. At this time, however, Ellis had not yet seen the helicopter.

In January 1968, Bell completed the assembly of the helicopter substantially conforming to the specifications set forth in the purchase order. Minor variations existed between the helicopter as assembled and the helicopter as specified in the purchase order. However, these variations were not substantial enough to justify the characterization of the helicopter as "nonconforming" under ORS 72.5100.

In January 1968, Bell notified Ellis that the helicopter would be at his disposal in early February, and requested that he take delivery at that time. The purchase order requires the buyer to take delivery within ten days of notice that the helicopter is ready. Ellis, without knowledge of the contents of the purchase order, asked for a delivery date in March.

In a subsequent telephone conversation, Bell informed Ellis that Bell did not have room at their plant to store a JetRanger until March, and that they had made arrangements for the helicopter to be stored at a nearby airport. Bell asked Ellis to write a letter approving those arrangements. On January 19, 1968, Ellis wrote to Bell as follows:

"* * * It is my understanding that you expect me and my wife Mitzi to spend a week in Fort Worth, Texas getting the transition training to fly the JetRanger, and that delivery will be made in Fort Worth. We do not expect to be available for this training until either the week starting March 10th or the week starting March 17, 1968. * * *

"Since it is so long before we will be ready for the training, we understand you have made arrangements for storage of the JetRanger until then. This letter authorizes you to deliver the JetRanger for storage and safekeeping for me to Mr. M. H. Spinks, Sr. of Alsco, Inc., Oak Grove Airport, Box 11099, Fort Worth, Texas 76110.

"I hereby authorize you and Mr. Spinks to allow this JetRanger to be used by either or both C. Norman Winningstad and Stuart White for their transition training to fly the JetRanger. * * *"

On February 6, 1968, Bell flew the completed helicopter from its plant at Saginaw, Texas, to Oak Grove Airport, and left the helicopter in the care of M. H. Spinks. An employee of Spinks signed a copy of a shipping document and a parts list, both of which recited the date and the word, "Accepted." Spinks did not notify Ellis that the helicopter had been delivered to him; nor did Spinks charge Ellis for the storage.

On March 11, Ellis and his wife appeared at the Bell factory and attended ground school. On or about March 12, a Bell pilot took possession of the helicopter from Spinks and flew it back to the Bell factory. Spinks did not ask Ellis for permission to redeliver to Bell. Ellis had asked to go along, but Bell employees told him to wait at the Bell plant. Thus, when Ellis first saw his new helicopter, it was in the air, being flown by a Bell flight crew.

On March 13, Bell's flight instructor and Mrs. Ellis began a 40-minute training flight. They were accompanied by Mr. Ellis and another Bell employee who went along as a trainee or observer for the benefit of Bell. Mrs. Ellis subsequently complained of motion sickness, and her training flight was terminated. Ellis then moved into the pilot's seat and began his first instructional flight, which, after 18 minutes, terminated in the crash.

A Bell employee was in command of the helicopter throughout the day. After the crash, Bell immediately took charge of the wreckage. Bell still controls the salvage.

Insofar as the question of the receipt of the goods is a question of fact, I find that Bell did not, prior to the accident, sufficiently relinquish dominion and control over the helicopter to constitute the delivery to Spinks a receipt by Ellis.

Delivery to Spinks was, at least partially, for the benefit of Bell and, at best, was equivocal conduct, proving nothing about risk of loss. Spinks could not bind Ellis or affect the risk of loss, because Ellis had authorized storage only and had not appointed Spinks to inspect and accept goods on his behalf.

■ Ellis consented to the bailment, but Bell did not, at any time before the helicopter crashed, surrender to Ellis complete dominion and control over the helicopter. The helicopter remained, until it was destroyed, under the practical control of Bell. It would have continued to remain under Bell's control until Ellis had completed his full five hours of training, a matter of some two or three days.

The letters and other documents which were offered by Bell to show that the delivery to Spinks was intended to be delivery to Ellis are self-serving or equivocal. These documents do not prevent a finding that Ellis did not receive the helicopter prior to its destruction.

Under Section 2–509(3) of the Uniform Commercial Code, a merchant seller cannot transfer risk of loss to the buyer until the buyer has actually received the merchandise. This rule holds even though the buyer has paid the full price and has been notified that the goods are at his disposal. Official Comment, Uniform Laws Annotated § 2–509, at 337 (1968).

The comment explains that a merchant who is to make delivery at his own place continues meanwhile to control the goods and can be expected to carry insurance to protect his interest in them. The buyer, on the other hand, has no control of the goods and may or may not have had the foresight to obtain insurance on undelivered merchandise.

■ In this case, of course, Ellis had an insurable interest and could have insured the helicopter for hull damage. Nevertheless, the acquisition of an insurable interest does not necessarily carry with it the "receipt" of the goods.

Because I have found that Ellis did not receive the helicopter, it follows that the risk of loss remained with Bell.

On the issues of negligence and contributory negligence, the evidence was in sharp conflict. Litigation arising out of an injury to a Bell employee in the same crash is now pending in the Northern District of Texas. In order to avoid prejudging an issue to be tried in that litigation, I express no opinion on negligence. At the conclusion of the trial, counsel stipulated that if the risk of loss should be found to be with Bell, Bell would refund the purchase price without regard to negligence. Bell is, of course, entitled to the salvage.

This opinion shall constitute findings of fact and conclusions of law within the meaning of Fed.R.Civ.P. 52(a), and the Clerk is directed to enter judgment for the plaintiff and against the defendant as prayed in the complaint. Fed.R.Civ. P. 58.