[No. 1821-2. Division Two. January 15, 1976.]

WALLACE R. GALBRAITH, ET AL, *Respondents*, v. AMERICAN MOTORHOME CORPORATION, ET AL, *Appellants*, FOREMOST INSURANCE COMPANY, ET AL, *Respondents*.

*Frederick V. Betts* and *Douglas S. Dunham* (of *Skeel, McKelvy, Henke, Evenson & Betts*), for appellants.

*Jack Ackerman*, for respondents.

REED, J.—This is an action by Galbraiths to recover the purchase price paid for a motorcoach which was extensively damaged by fire on June 30, 1972, while still on the seller's premises. Purchasers sought other relief, but the only issues on appeal arise from a partial summary judgment granted in favor of plaintiffs and against defendants, American Motorhomes Corporation and Motorhome Service Center, for the total purchase price paid, and interest. Fun Fleet, Inc., and Motorhome Fun Fleet, Inc., were dismissed on plaintiff's motion.

On June 5, 1972, Galbraiths signed a purchase order with Motorhome Service Center, a division of Fun Fleet, Inc., now American Motorhome Corporation, for the purchase of a 28-foot Krager Motorhome. The seller was to perform certain conversion and customizing work prior to delivery, which was estimated to be "the first part of July, 1972." Galbraiths paid $5,000 down on a total purchase price of $20,134.

On June 25, 1972, while the motorcoach remained on the seller's premises and the customizing work was in progress, the parties executed an "Agency Rental Agreement" which provided *inter alia* that *"at the owner's request"* the agent (Motorhome Service Center) would store the vehicle at the agent's location without charge to the owner and rent it to other parties on certain terms and conditions. Galbraiths were to obtain "renter's insurance."

On June 27, 1972, Galbraiths paid the balance of the purchase price, registered the vehicle with the State of Washington Department of Motor Vehicles, and secured a policy insuring against certain risks including comprehensive and collision coverage. On June 30, 1972, while defendants' employees were working on the motorcoach, a fire occurred in the vehicle causing substantial damage and giving rise to this lawsuit.

The issues presented by the appeal are: (1) Who bore the risk of loss on June 30, 1972? (2) Did the trial court err in finding there was no genuine issue of material fact and in placing the risk of loss upon the seller as a matter of

law? We agree with the trial court's determination and accordingly affirm.

The parties agree that the provisions of the Uniform Commercial Code are controlling in this case but disagree as to which subsection of RCW 62A.2-509 applies. That statute reads in part as follows:

Risk of loss in the absence of breach.

. . .

(2) Where the goods are held by a bailee to be delivered without being moved, the risk of loss passes to the buyer
(a) on his receipt of a negotiable document of title covering the goods; or
(b) on acknowledgment by the bailee of the buyer's right to possession of the goods; or
(c) after his receipt of a non-negotiable document of title or other written direction to deliver, . . .
(3) In any case not within subsection (1) or (2), the risk of loss passes to the buyer on his receipt of the goods if the seller is a merchant; otherwise the risk passes to the buyer on tender of delivery.
(4) The provisions of this section are subject to contrary agreement of the parties . . .

The trial court held there had been no delivery or receipt of the goods and that subsection (3) controlled.

No contention is made that the motorcoach did not constitute "goods" or that the seller is not a "merchant" as those terms are defined in the act.[1]

Defendants first contend there are genuine issues of material fact which, if resolved in their favor, would bring this case within subsection (2), thus placing the risk of loss on Galbraiths. These provisions clearly presuppose the existence of a bailment of the goods. Defendants argue that the rental agreement of June 25 gave rise to such a bailment. We disagree. It is clear from the terms of the rental agreement that it contemplated a "delivery" of a completed product to Galbraiths and a redelivery, either actual or constructive, from the plaintiff to defendants before any

---

[1] RCW 62A.2-104(1), 105(1).

such bailment could arise.[2] The agreement contained nei-ther approval nor acceptance of the vehicle in its then uncompleted stage. Neither did it provide for a commencement date for the "bailment." The rental agreement, when read in the light of the original agreement of the parties and *absent any evidence to the contrary*, clearly indicates the parties still considered the first of July or thereabouts as a completion and delivery date—the earliest date when the rental agreement could be activated by the owner's request. No such request was ever made.

Defendants furnished no contradictory evidence and make no contention there is such evidence. Rather, defendants admitted during discovery the following critical facts: (1) that on June 30, the work was still being performed on the coach, (2) that the fire occurred while defendants' employees were actively working on the coach, (3) that the parties had agreed upon a completion and delivery date of early July 1972, and (4) that "the motorcoach *was not ready for delivery* to the plaintiff, *nor had it yet been prepared in accordance with the contract between the parties*." (Italics ours.)

These uncontroverted material facts support the trial court's finding as a matter of law that no bailment of the motorcoach was created by the rental agreement. Subsection (2) is not applicable.

Defendants next contend there is a genuine issue of fact as to whether the rental agreement served under subsection (4) as a "contrary agreement of the parties." Again, the court was presented with no facts save those set forth above and its task was simply one of construing the statute as it applied to those facts.

We agree with the trial court's determination that subsection (4) did not apply in this case to place risk of loss on the buyer. The "contrary agreement" of the parties

---

[2]For the proposition that seller will rarely, if ever, be a "bailee" as the term is used in subsection (2), see the discussion by J. White & R. Summers, *Uniform Commercial Code* § 5-3, at 144 (1972), with particular reference to footnote 18, at 144.

must expressly shift the risk of loss and such a shift will not readily be inferred. In *Hayward v. Postma*, 31 Mich. App. 720, 188 N.W.2d 31 (1971), plaintiff purchased a yacht from defendant, executing a security agreement in March to finance the purchase price while the boat remained with the seller so that he might install certain options. The security agreement required *inter alia* that the purchaser would keep the boat fully insured. In April, while the boat was still on seller's premises, it was destroyed by fire. The court rejected the seller's contention that the insurance requirements of the security agreement constituted a contrary agreement of the parties under subsection (4), saying at pages 724-25:

> On the contrary, we feel that a contract which shifts the risk of loss to the buyer before he receives the goods is so unusual that a seller who wants to achieve this result must make his intent very clear to the buyer.
>
> . . .
>
> We do not mean to say that parties may not validly agree on who bears the risk of loss; rather, we hold that if they intend to shift that burden to the buyer before his receipt of the goods, they must do so in clear and unequivocal language.

The rationale of the risk of loss rules contained in RCW 62A.2-509 is to place the risk of loss on the party most likely to insure the goods. The rules recognize that a merchant who is to make physical delivery at his own place of business continues to exercise dominion and control over the goods and can be expected to insure his interest in them until delivery. Official Comment 3, RCWA 62A.2-509. While both seller and buyer have an insurable interest in the goods before delivery,[3] the buyer may elect to insure his interest or not. Whether he insures or not does not determine when the risk of loss shifts. *Ellis v. Bell Aerospace Corp.*, 315 F. Supp. 221 (D. Ore. 1970). Therefore, the fact that Galbraiths might in fact have procured insurance in connection with financing the balance of the purchase

---

[3]RCW 62A.2-501.

price is of no consequence. To so hold would do violence to the theory of the rules.

Accordingly, since there was no bailment under subsection (2) and no "contrary agreement" of the parties under subsection (4), the trial judge was correct in holding that the risk of loss reposed in the seller under subsection (3) of RCW 62A.2-509, the purchaser not having received the motorcoach.

The rule is enunciated in *Ellis v. Bell Aerospace Corp.*, *supra* at page 224:

> Under Section 2-509(3) of the Uniform Commercial Code, a merchant seller cannot transfer risk of loss to the buyer until the buyer has actually received the merchandise. This rule holds even though the buyer has paid the full price and has been notified that the goods are at his disposal. Official Comment, Uniform Laws Annotated § 2-509, at 337 (1968).

Judgment affirmed.

PETRIE, C.J., and PEARSON, J., concur.