CENTURIAN CORPORATION,
Plaintiff and Appellant,

v.

A. L. CRIPPS and Walter Cripps,
Defendants and Respondents.

PETTY MOTOR LEASE, INC., Plaintiff
in Intervention and Respondent,

v.

CENTURIAN CORPORATION, Richard
Nickles and Margaret K. Nickles, Defendants in Intervention and Appellants.

No. 16971.

Supreme Court of Utah.

Jan. 29, 1981.

James R. Brown of Jardine, Linebaugh, Brown & Dunn, Salt Lake City, for plaintiff and appellant.

Wayne G. Petty of Moyle & Draper, Salt Lake City, Bryce K. Bryner, Price, for defendants and respondents.

HALL, Justice:

Plaintiff Centurian Corporation (hereafter "Centurian") and plaintiff in intervention Petty Motor Lease, Inc., (hereafter "Petty Motor") take cross-appeals from the trial court's decision below, awarding Petty Motor damages against Centurian for the latter's failure to perform according to the terms of a purchase and sale agreement. This marks the second appeal of the instant case, the matter having been remanded to the lower court once before for consideration of the merits of Petty Motor's claims as intervenor.[1]

On February 1, 1973, Petty Motor and Centurian entered into an agreement referred to as a "lease." The subject of the agreement was a 1973 Trans-liner tank trailer. The agreement called for the payment, by Centurian, of $580 per month for 32 months.[2] As a condition thereto, Centurian was required to deposit with Petty Motor the sum of $3,594.63. The agreement was terminable by Centurian (and by Petty Motor, upon violation by Centurian of any of the terms of the agreement) at any time during the payment period. Pursuant to such termination, however, Centurian would be liable for

the final lease payment in full, and, in addition thereto, ... 45% of the monthly rental multiplied by the number of months the lease has yet to run ....

While Centurian agreed to carry property and public liability insurance, the agreement imposed upon neither party the obligation to maintain fire, theft, or collision insurance. The agreement stated, however, that

[Petty Motor] may have in effect at the commencement of this lease fire, theft, comprehensive and $100 deductible collision insurance. If [Centurian] furnishes [Petty Motor] with evidence of satisfactory insurance coverage within 15 days from the commencement of the lease, [Petty Motor's] insurance policy shall be terminated with no expense to [Centurian].

Five days later, Petty Motor and Centurian entered into an additional agreement titled "Agreement of Sale and Purchase." Reference was made therein to the prior agreement between the parties, after which it was set forth that the parties wished to effect a sale of the unit "at the termination of the lease, after all payments called for by the lease have been paid." To this end, the agreement stated that Centurian

will pay to [Petty Motor] the sum of SIX HUNDRED TWENTY ONE & 00/100 Dollars plus applicable sales tax and interest at 6 percent per annum (6%), plus any deposits or advanced payments made and [Petty Motor] shall keep all payments made or monies paid or deposited under the terms of the lease referred to above. This agreement is binding on both parties.

On May 21, 1973, Centurian, then in possession of the tank trailer in question, entered into an agreement with defendants A. L. Cripps and Walter Cripps (hereafter "Cripps"). Under that agreement, Centurian (referred to in the agreement as "seller") transferred possession of the tank trailer to Cripps, and assigned to Cripps (referred to as "purchaser"),

all of its right, title and interest in and to that certain lease agreement dated the first day of February, 1973, between the seller and Petty Motor Lease, Inc.

Cripps agreed to "hold seller harmless from and does hereby assume and agree to pay [the sum due under the Centurian-Petty Motor agreement]." Cripps was required by the agreement to pay a monthly sum of $600, or 25 percent of all amounts received by Cripps from the use of the trailer by any third party after deducting royalties and driver's wages. It was agreed that such payments would be applied first to Centurian's obligation under its agreement with Petty Motor, any surplus being applied to Centurian's "equity" in the tank trailer, valued at $5,587.55 at the time of the agreement with Cripps. Attached to the May 21

---

1. *Centurian Corp. v. Cripps*, Utah, 577 P.2d 955 (1978).

2. The addition of taxes brought the monthly payment to $606.10.

agreement was a copy of the "lease" agreement, and the agreement of sale and purchase entered into by Petty Motor and Centurian.

Following the signing of this latter agreement, and continuing until the last part of November, 1973, Cripps was sporadic in making payments to Centurian. Centurian did not seek legal remedy during this period, but carried forward Cripps' various deficits on its balance sheet.[3] Finally, in the latter part of December, 1973, Centurian turned down an additional part payment by Cripps, and, on December 19, 1973, advised Cripps by letter that it was thereby demanding, under the terms of the agreement, immediate payment of all sums due as of the date of the correspondence. The letter concluded by requesting response within ten days. There being no response given within the allotted time, Centurian contacted Pacific Intermountain Express (then in possession of the tank trailer in question by reason of a lease agreement with Cripps), and requested that the trailer be grounded. Sometime before or after Pacific Intermountain Express effectuated this grounding request,[4] on March 29, 1974, the tank trailer was reported stolen.

Prior to the theft, Centurian had initiated suit against Cripps for the deficiency due under the agreement, and had sought a writ of replevin for return of the tank trailer. An amended complaint sought damages for deficiencies under the agreement, together with the estimated value of the tank trailer. Petty Motor attempted to intervene in the action, asserting that Centurian had ceased payment pursuant to the agreement between Centurian and Petty Motor upon the tank trailer's disappearance. The trial court dismissed the claims of Petty Motor on jurisdictional grounds, and awarded plaintiff damages in the amount of $1,903.87, plus attorney's fees. On appeal, this Court remanded with directions to retry the matter in light of the merits of Petty Motor's claims.[5]

On remand, the trial court found that the agreement between Petty Motor and Centurian constituted an agreement of sale and purchase, with retention of security interest in Petty Motor, and that the risk of loss of the tank trailer thereby passed to Centurian. The trial court further affirmed the prior judgment against Cripps, but denied further relief on the grounds that, by grounding the trailer, Centurian breached the provisions of the agreement between Centurian and Cripps, and thereby released Cripps from the obligation to hold Centurian harmless from all liability. Petty Motor was awarded reasonable attorney's fees.

With regard to Centurian's first challenge to the trial court's decision, we affirm that the agreement between Petty Motor and Centurian was one of purchase and sale, thereby passing the risk of loss to Centurian, there being no alternative allocation of the risk by contract.

■ Under Utah law, when a transaction purports on its face to be a lease, but is in fact a sale with reservation of a security interest in the vendor, it becomes subject to the law of sales. "Whether a lease is intended as security is to be determined by the facts of each case ..."[6] Litigation

---

3. It is instructive to note that Centurian's balance sheet showed an opening balance on Cripps' account of $5,587.55: the amount which it claimed as its "equity" in the tank trailer under the agreement with Cripps. During the period when payments were received from Cripps, Centurian credited such payments against this balance, and debited therefrom all payments which Centurian made to Petty Motor.

4. It is unclear from the evidence whether the tank trailer was actually returned to the possession of Pacific Intermountain Express and grounded as per Centurian's instructions prior to the theft of the trailer. In light of our disposition of the matter, however, this point is irrelevant.

5. See footnote 1, supra.

6. U.C.A., 1953, 70A–1–201(37). It is to be noted that, while the language of the statute makes the intent of the parties determinative, the determination of that intent is purely objective: What is the overall *effect* of the agreement? See *Arnold Machinery Company v. Balls*, Utah, 624 P.2d 678 (1981); IC, Bender's Uniform Commercial Code, Section 29A.05(1)(d).

relevant to the determination of the nature of an agreement under this provision has been profuse, and the tests formulated thereby numerous. It has been suggested that a lease agreement is actually a purchase and sale agreement if the "lease payments" are clearly designed to establish an ownership interest in the "lessee";[7] if the "lessee" treats the payments as building up equity in the property concerned;[8] or if the "lessee" is constrained to become the owner of the property at the termination of the lease, either by contractual agreement[9] or as a matter of economic compulsion.[10]

■ Under any or all of the foregoing tests, the trial court was justified in ruling that the agreement between Petty Motor and Centurian was, in fact, a purchase and sale agreement *ab initio*. Centurian was required by the terms of the contract to purchase the tank trailer at the termination of the lease period. The purchase amount to be paid at that time clearly took into consideration the payments received by Petty Motor during the "lease" period. Construing both agreements together, it was reasonable to conclude the Centurian commenced purchase of the tank trailer upon signing the "agreement of sale and purchase," the incorporated prior "lease agreement" being merely a means to that end. The transaction thus became, from the outset, a sale to Centurian with a reserved security interest in the tank trailer held by Petty Motor.[11]

■ Under Utah's Uniform Commercial Code, the risk of loss of goods which are subject to an agreement of purchase and sale passes to the buyer of the goods on tender of delivery absent an agreement between the parties to the contrary.[12] This is the rule even in cases where the seller adopts a conditional sale agreement or otherwise retains a security interest in the goods.[13]

■ In the present case, the sale agreement between Centurian and Petty Motor contained no express allocation of risk of loss.[14] As such, the theft of the trailer did not absolve Centurian from its obligations under the agreement, and Petty Motor was entitled to pursue an action for the agreed price.[15]

The parties differ, however, regarding what constitutes the "agreed price" under the purchase agreement between Petty Motor and Centurian. The terms of the agreement called for 32 monthly payments of $606.10, with a final payment of $621, plus surrender of the $3,594.63 deposit. The agreement states, moreover, that Centurian

> agrees to pay all costs and expenses including reasonable attorney's fees, incurred by [Petty Motor] in enforcement of its rights under this agreement and agrees to pay interest at the highest rate allowed by law upon all amounts not paid when due.

The trial court awarded Petty Motor $11,600 (representing 20 unpaid installments under the agreement); $3,512 (being interest on the unpaid installments at the rate of six percent); $621 (the agreed purchase

7. *Lockwood Industrial Leasing Corp. v. Sabetta*, 16 UCC Rptr. 195 (Conn., 1974).

8. *Lease Finance, Inc. v. Burger*, Colo.App., 575 P.2d 857 (1977); *Eimco Corp. v. Sims*, 100 Idaho 390, 598 P.2d 538 (1979).

9. *In Re Leasing Consultants, Inc.*, 486 F.2d 367 (2nd Cir., 1973).

10. *FMA Financial Corp. v. Pro-Printers*, Utah, 590 P.2d 803 (1979); *In Re Alpha Creamery Co., Inc.*, 4 UCC Rptr. 794 (Mich.1967).

11. U.C.A., 1953, 70A–9–306(2).

12. U.C.A., 1953, 70A–2–509(3).

13. *Lair Distributing Co. v. Crump*, 48 Ala.App. 72, 261 So.2d 904 (1972); *Conte v. Styli*, 26 Mass.App.Dec. 73, 4 UCC Rptr. 737 (1963).

14. The fact that the agreement conferred upon Petty Motor the option to insure the tank trailer against theft or loss is irrelevant; the policy behind the legal provision in question is to place the risk of loss on the party most *likely* to insure the subject of the sale. See *Galbraith v. American Motorhome Corp.*, 14 Wash.App. 754, 545 P.2d 561 (1976). In any case, it is clear that both parties were accorded an option to take out insurance.

15. U.C.A., 1953, 70A–2–709(1)(a).

amount at the conclusion of the "lease" period); $229 (interest at six percent on the $621 purchase amount); and $540 (reasonable attorney's fees). The court then subtracted $3,594.63, representing a return of the deposit initially paid by Centurian to Petty Motor. Petty Motor claims error in that (1) six percent per annum is not the "highest rate allowed by law" as provided in the agreement, and (2) retention of the deposit sum by Petty Motor was intended by the parties as part of the purchase price.

■ In construing the parties' intent in agreeing upon interest at the "highest rate allowed by law," it is relevant to note that, under Utah's Uniform Consumer Credit Code, all prior usury statutes in Utah were repealed.[16] In place thereof, various maximum interest rates were established for diverse types of consumer credit sales or consumer-related loans. Petty Motor points to that provision which provides that

> with respect to a consumer loan other than a supervised loan . . ., a lender may contract for and receive a loan finance charge, calculated according to the actuarial method, not exceeding 18 percent per year on the unpaid balances of the principal.[17]

It is to be noted, however, that Centurian's existence as a corporation rather than a person defeats characterization of the present transaction as a consumer loan,[18] a consumer credit sale,[19] a consumer-related loan,[20] or a consumer-related sale.[21] As such, the law specifically disclaims any maximum interest amount, pointing out that parties to agreements such as that here under consideration, "may contract for the payment by the debtor of any loan finance charge."[22] Inasmuch as the parties did not

so contract, the trial court was justified in referring to the legal interest rate currently established by Utah law: six percent per annum.[23]

■ We must agree with Petty Motor's assertion, however, that retention of the deposit was an agreed-upon portion of the purchase price of the tank trailer, and that the trial court erred in deducting it from the amount recoverable. We therefore reverse and remand with direction to enter judgment in the amount of $15,962, plus $540 in attorney's fees.

Centurian, as cross-appellant, asserts that, in the event that it is found liable to Petty Motor for the purchase price, it is entitled to indemnification from Cripps. We agree and reverse the decision of the trial court on this issue.

The findings of the lower court labeled the agreement between Centurian and Cripps a lease agreement, rather than a sale of the tank trailer. On remand, the lower court ruled that Centurian's action in grounding the tank trailer following Cripps' repeated delinquencies in payment constituted a breach of that least agreement, entitling Centurian to recovery of unpaid lease payments, but giving them no relief against Cripps for the value of the stolen trailer.

■ The interpretation of a contractual agreement, including the intent of the parties thereto, is to be ascertained primarily from the face of the document itself.[24] In the absence of ambiguity, such interpretation is a question of law.[25] The agreement between Cripps and Centurian clearly purports, on its face, to be an agreement of purchase and sale. Centurian is referred to

---

**16.** U.C.A., 1953, 70B–9–103.

**17.** U.C.A., 1953, 70B–3–201(1). See also, U.C.A., 1953, 70B–2–201(2).

**18.** U.C.A., 1953, 70B–3–104.

**19.** U.C.A., 1953, 70B–2–104.

**20.** U.C.A., 1953, 70B–3–602.

**21.** U.C.A., 1953, 70B–2–602.

**22.** U.C.A., 1953, 70B–3–605.

**23.** U.C.A., 1953, 15–1–1.

**24.** *Larrabee v. Royal Dairy Products Co.*, Utah, 614 P.2d 160 (1980); *Land v. Land*, Utah, 605 P.2d 1248 (1980); *Big Butte Ranch, Inc. v. Holm*, Utah, 570 P.2d 690 (1977).

**25.** *Overson v. United States Fidelity and Guarantee*, Utah, 587 P.2d 149 (1978).

as the seller; A. L. Cripps and Walter Cripps sign as purchasers. Centurian, as seller, assigns to Cripps, as purchaser, all right, title and interest to the tank trailer held by Centurian under its sale agreement with Petty Motor. Cripps, as purchaser, agrees to assume, pay, and hold Centurian harmless from, the obligations imposed by that prior sale agreement.[26] Hence, Cripps, by reason of the incorporation of the sales agreement between Petty Motor and Centurian, became purchaser and owner of the tank trailer upon concluding its agreement with Centurian, the price to be paid therefor equalling that owed Petty Motor by Centurian under the prior agreement.[27]

■ Again, the sales agreement contains no allocation of risk of loss between Centurian and Cripps. By operation of law, therefore, such risk passed to Cripps at the time the tank trailer was delivered.[28]

■ Cripps argues, however, that it was released from liability for loss of the trailer by reason of Centurian's breach of the agreement in grounding the trailer, thereby prohibiting Cripps from performing the lease agreement with Pacific Intermountain Express. Having accepted the tank trailer under an agreement of purchase and sale, together with the attendant risk of loss, Cripps was entitled to repudiate the contract upon any breach by Centurian, and to seek incidental damages occasioned by that breach,[29] but may not rescind and retain the value of the trailer.[30]

■ Moreover, there is no evidence that Centurian's action in grounding the trailer constituted a breach of the sale agreement. That agreement provides that

> in the event of any default in the payments reserved to seller herein, the seller shall have the right to repossess said tank trailer unit with or without legal process and have all remedies provided by law
>
> . . . .

By his own admission, Walter Cripps was substantially in arrears on payments to Centurian under the sale agreement. Reasonable notice, both written and oral, was afforded Cripps that Centurian would repossess the tank trailer in the event the deficiency were not rectified. Centurian was not legally obligated to permit Cripps to continue in breach of the sale agreement in order to enable Cripps, by lease of the tank trailer, to generate revenues for payment of his obligations. We therefore hold that Centurian did not breach the agreement of sale and purchase by grounding the tank trailer.

**26.** The trial court's initial finding that the agreement between Centurian and Cripps constituted a lease rather than a sale rested on the observation that it incorporated by reference only the lease portion of the agreement between Petty Motor and Centurian. The language of the Cripps agreement, however, refers to the "lease agreement" as "exhibit A," attached to the Cripps agreement. That agreement then specifically provides that "purchaser agrees that he will hold seller harmless from and does hereby assume and agree to pay exhibit A, attached hereto." Exhibit A includes not only the lease portion of the Petty Motor agreement, but also the sale and purchase agreement. It therefore appears that Cripps assumed the obligation imposed by both documents, and that both are incorporated into the second agreement.

**27.** It is not clear whether Centurian's right to terminate the "lease" agreement with Petty Motor survived the modification of that agreement in the form of the agreement of sale and purchase. It seems most likely, however, that the sale agreement between Petty Motor and Centurian abrogated the termination option, and obligated Centurian to make all payments, followed by the final purchase payment. These obligations would thus be similarly incumbent upon Cripps pursuant to the second agreement.

**28.** U.C.A., 1953, 70A–2–509(3). It should be observed that the subsequent sale to Cripps did not relieve Centurian of its obligation to bear any risk of loss vis-a-vis its own seller, Petty Motor. While passage of the risk of loss to Cripps pursuant to the second sale entitles Centurian to indemnity therefor, Centurian remains liable under its own sales contract. Petty Motor would have had the right, pursuant to its security interest in the proceeds from Centurian's disposition of the tank trailer to proceed directly against Cripps on the basis of the second purchase and sale agreement. See U.C.A., 1953, 70A–9–306(2). Petty Motor also, however, had the option to move directly against Centurian on the underlying debt itself.

**29.** U.C.A., 1953, 70A–2–715.

**30.** U.C.A., 1953, 70A–2–714.

Based on the foregoing, we hold that Cripps is liable to Centurian for damages in an amount equal to the total purchase price for which Centurian was obligated to Petty Motor, less payments made to Centurian under the sale agreement. There having been no findings of fact relative to this amount, we hereby remand to the trial court for a determination thereof.

Finally, Petty Motor seeks an additional award of attorney's fees for expenses incurred in the remand and second appeal of this matter. There having been contractual agreement that Centurian would pay all costs and expenses including reasonable attorney's fees incurred by Petty Motor pursuant to enforcement of the sale agreement, we hereby remand for a determination of reasonable attorney's fees, and a judgment in accordance therewith.[31]

Reversed and remanded for further action consistent with this opinion.

MAUGHAN, C. J., and STEWART, HOWE and CROCKETT *, JJ., concur.

---

31. *Management Services Corp. v. Development Associates,* Utah, 617 P.2d 406 (1980).

* Crockett, Justice, concurred in this case before his retirement.