**KEY EQUIPMENT FINANCE INC., Plaintiff,**

v.

**PIONEER TRANSPORTATION, LTD., Defendant.**

No. 06–C–297–S.

United States District Court, W.D. Wisconsin.

Jan. 17, 2007.

Pioneer Transportation, Ltd, Merrill, WI, pro se.

## MEMORANDUM AND ORDER

SHABAZ, District Judge.

Plaintiff Key Equipment Finance Inc. commenced this action against defendant Pioneer Transportation, Ltd. alleging default of obligations owed under finance lease agreements pursuant to Article 2A of the Uniform Commercial Code and breach of contract. Plaintiff seeks monetary relief in this action. Jurisdiction is based on 28 U.S.C. § 1332(a)(1). The matter is presently before the Court on plaintiff's motion for summary judgment. Also presently before the Court is defendant's motion for partial summary judgment. The following facts are either undisputed or those most favorable to the non-moving party.

## BACKGROUND

Plaintiff Key Equipment Finance Inc. is a Michigan corporation with its principal place of business in Superior, Colorado. As is relevant to this action, plaintiff is engaged in the business of providing financing to customers for the purchase of equipment from third-party suppliers. Defendant Pioneer Transportation, Ltd. is a Wisconsin corporation with its principal place of business in Merrill, Wisconsin. Defendant is engaged in the trucking business. Accordingly, defendant contracts with businesses to transport their freight throughout the United States and Canada.

In 2003, defendant began exploring alternative ways of communicating with its truck drivers while they were in transit

because traditional telephone communication was not efficient. As such, in either May or June of 2003 defendant's General Manager Mr. Joseph Hildebrand received a telephone call from a representative of Global T–Fleet, Inc. (hereinafter Global) named Mr. Joe Joseph. Mr. Joseph informed Mr. Hildebrand that Global had developed a messaging system for trucking companies which used FM frequencies to transmit messages. Additionally, Mr. Joseph indicated that while Global's system was less expensive than similar messaging systems using satellite technology its system worked just as well as those systems. Mr. Hildebrand expressed interest in learning more about Global's system. Accordingly, on or about June 9, 2003 he received a brochure and demonstration disk from Global concerning its system.

Global's brochure contained both general background information and information concerning how its system operated. Said information provided in relevant part as follows:

> ... Global ... now offers you a low-cost, high quality mobile communications and tracing alternative that makes it easy to keep up with your fleet....
> ... [W]e use the nation's existing FM infrastructure for even greater cost efficiency. So you get the coverage of satellite for less than you may be paying for cellular.
> Unlike satellite coverage, the Global ... signal does not deteriorate in large metro areas-where messaging is critical....
> ... Inbound messages from vehicle to dispatch transmit via DHF network to the Network Operations Center. Outbound messages from dispatch to vehicle transmit via FM sub-carrier frequencies leased to Global ... by FM stations across the country. Vehicle position reports are generated via GPS....
> ... Global['s] ... patented digital high frequency (DHF) network and the existing FM infrastructure provides coast-to-coast coverage for your entire fleet....
> ... Vehicle Hardware Intelligent Transceiver Unit [t]he 'brains' behind the on-board system. The ITU transmits DHF signals from the driver and receives FM sub-carrier data signals from dispatch....

Mr. Hildebrand reviewed the statements contained in Global's brochure. Additionally, Mr. Hildebrand was told that Global had access to a sufficient number of FM frequencies to ensure delivery of defendant's messages regardless of a truck's location. Accordingly, Mr. Hildebrand recommended that defendant purchase Global's messaging system.[1]

On June 18, 2003 defendant executed a Credit Application which provides in relevant part as follows: "[defendant] has requested that Global find a leasing company ('lessor') to lease finance the purchase of the equipment described on Global's Product Purchase Form ..." On July 23, 2003 defendant executed the Product Purchase Form referenced in its Credit Application. Said Product Purchase form describes the products defendant was purchasing as follows: (1) eight T–Fleet Global Messenger Units, (2) a T–Fleet Global Tracker, (3) T–Fleet Software for Windows; and (4) a 60 month Message Service Plan. This Message Service Plan allowed each Global Messenger Unit to deliver and receive

---

1. Additionally, Mr. Hildebrand indicates that he both reviewed Global's demonstration disk and relied on representations made on said disk before recommending that defendant purchase Global's system. However, defendant admits the disk is inaccessible because it cannot locate the identification number needed to access the disk. Accordingly, the Court will not rely on any evidence concerning the demonstration disk in its memorandum and order because it is of no evidentiary value.

messages via FM frequencies leased by Global. To pay for its purchase, defendant agreed to submit monthly installment payments in the amount of $319.92 per month for a period of sixty months.

As such, on July 28, 2003 defendant entered into an agreement with American Express Business Finance Corporation (hereinafter American Express) entitled Master Lease Agreement to finance its acquisition of Global's system. Additionally, on said date defendant executed an Equipment Schedule to the Master Lease Agreement for the eight T–Fleet Global Messenger Units. Accordingly, the transaction worked as follows: plaintiff acquired the T–Fleet Global Messenger Units from Global and defendant acquired said units from plaintiff. However, before defendant executed the Master Lease Agreement and Equipment Schedule it evaluated Global's products for thirty days to confirm satisfactory performance.

Under the terms of the Master Lease Agreement and Equipment Schedule, defendant was not permitted to terminate its monthly payment obligation. Additionally, the Equipment Schedule contains a provision entitled "Purchase Obligation" which provides as follows:

> Lessee [defendant] irrevocably and unconditionally agrees to purchase all (but not less than all) of the Equipment, **"AS IS," "WHERE IS,"** without representation or warranty of any kind from Lessor, [plaintiff] for the Purchase Amount shown above ... upon the expiration of the Initial Term of this Schedule.

The Purchase Amount referenced in this "Purchase Obligation" provision is $1.00.

On July 25, 2003 (before defendant executed the Master Lease Agreement and Equipment Schedule) Global invoiced American Express in the amount of $14,715.76 for the eight T–Fleet Global Messenger Units and the T–Fleet Software. However, it is undisputed that de-

fendant and not American Express selected Global as the supplier for the transaction.

The Master Lease Agreement contains numerous provisions governing plaintiff and defendant's relationship under the contract. Said provisions provide as follows:

> **UCC Filings. Lessee [defendant] acknowledges that this Lease is intended to be a "finance lease" as defined in § 2A–103(1)(g) of the Uniform Commercial Code, as in effect in Utah ("UCC"). LESSEE WAIVES ANY AND ALL RIGHTS AND REMEDIES OTHERWISE GRANTED TO LESSEE BY UCC §§ 2a–508 THROUGH 2A–522.** Lessee authorizes Lessor [plaintiff] to file UCC financing statements disclosing Lessor's interest in the Equipment and in any "Additional Collateral" set forth in any Schedule.

> ***Disclaimers*** Lessor is not the manufacturer or supplier of any Equipment and is not responsible for any delivery, installation, repair, maintenance or servicing thereof and Lessor shall have no obligations, or liabilities of any kind whatsoever concerning or relating to the Equipment.... So long as Lessee is not in default under the Lease, Lessee is entitled to any and all warranties provided to Lessor by or through Supplier or the manufacturer, and may communicate with Supplier and the manufacturer, and receive those warranties. So long as Lessee is not in default under the Lease, Lessor assigns such warranties to Lessee for the duration of the Lease Term. Lessee agrees to look only to Supplier or the manufacturer for any defect or breach of warranty regarding the Equipment. **LESSEE LEASES THE EQUIPMENT ON AN "AS–IS", "WHERE IS" BASIS. LESSOR MAKES NO REPRESENTATION OR**

WARRANTY OF ANY KIND WHAT-SOEVER, EXPRESS OR IMPLIED, REGARDING ANY EQUIPMENT, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

*Obligations Absolute.* NOTWITHSTANDING ANY CLAIM OF DEFECT OR ANY OTHER REASON WHATSOEVER, ALL RENTALS AND OTHER PAYMENTS UNDER EACH LEASE SHALL BE PAID BY LESSEE TO LESSOR OR ITS ASSIGNEES ABSOLUTELY AND UNCONDITIONALLY, WITHOUT ANY DEFENSE, SETOFF, CLAIM OR COUNTERCLAIM OF ANY NATURE....

Throughout the course of the parties' relationship defendant executed five additional Equipment Schedules to the Master Lease Agreement which the parties treated as separate contracts. Defendant executed these Schedules on August 12, 2003, September 18, 2003, November 14, 2003, December 4, 2003; and February 3, 2004. The purpose of these additional Equipment Schedules was to finance defendant's acquisition of: (1) fifty-two additional T-Fleet Global Messenger Units, (2) additional T-Fleet Software; and (3) additional Message Service Plans. Each of the five subsequent Equipment Schedules contained the identical "Purchase Obligation" provision included within the original Equipment Schedule of July 28, 2003. Additionally, (as was the case with the original Equipment Schedule) defendant was not permitted to terminate its monthly payment obligation under the terms of the five additional Equipment Schedules. Finally, the terms of the Master Lease

Agreement were incorporated into each subsequent Equipment Schedule. Accordingly, under the six equipment schedules defendant would pay American Express a total amount of $151,272.16 for the subject equipment and services while Global invoiced American Express a total amount of $110,368.20.[2]

Defendant installed the T-Fleet Global Messenger Units in its trucks and used said units to convey messages between its dispatchers and its drivers as they traveled throughout the United States and Canada. Defendant never rejected any of the deliveries and it accepted each shipment without reservation or objection. The units initially functioned as represented. However, in approximately February of 2005 they began failing to either send or receive messages. At first, approximately ten percent of defendant's messages failed to reach their destination. When such failures began to occur defendant immediately contacted Global. In his affidavit, Mr. Hildebrand indicates he was informed that Global was having technical problems with the FM service in certain areas. However, Mr. Hildebrand also indicates he was assured that such problems would be corrected in the near future.

In March of 2005 twenty to thirty percent of defendant's messages were lost in transit. During this period Mr. Hildebrand indicates he was in continuous contact with Global concerning such failures and that he was repeatedly assured the technical problems would be corrected soon. However, defendant subsequently learned that Global had lost access to the FM frequencies of Clear Channel which was one of the major frequency providers. Additionally, in April of 2005 Global stopped returning defendant's telephone

---

**2.** On March 1, 2005 plaintiff acquired American Express. As such, plaintiff assumed American Express' rights and obligations under defendant's Master Lease Agreements and associated Equipment Schedules.

calls and by May of 2005 the Global Messenger Units failed to either deliver or receive any messages. Accordingly, defendant stopped using the units completely and it ceased submitting its monthly payments after it submitted its May, 2005 payment.

On June 10, 2005 defendant's attorney attempted to contact plaintiff by telephone. As such, he left a message for plaintiff's representative Ms. Dawn Schlosser in which he explained that the Global Messenger Units were no longer functioning and he asked her to contact him. On June 13, 2005 plaintiff responded by letter to defendant's attorney's inquiry. Said letter (which defendant received six identical copies of) provides in relevant part as follows:

> It has come to our attention that you may be having problems with the equipment on the above referenced Agreement. Please be advised that equipment problems do not affect your obligation to make payments as scheduled. For your clarification, please review the terms of the Disclaimer section of the Agreement.

On June 22, 2005 defendant's attorney responded by letter to plaintiff's communication. In said letter he advised plaintiff that the Global Messenger Units were "worthless" because the essential communication services were not being provided. Additionally, defendant's attorney requested that plaintiff "make arrangements to pick up this equipment." On that same date, plaintiff advised defendant by letter that its account was delinquent because of its failure to submit timely payments under the Master Lease Agreement. Accordingly, plaintiff called a default under said Agreement.

After plaintiff called a default, it exercised its option to "accelerate and collect the unpaid balance of the remaining Rentals scheduled to be paid under any or all leases, together with Lessor's anticipated residual interest in any or all of the Equipment subject therein, both discounted to present value at a rate of 5.5% per annum...." Accordingly, plaintiff indicates that as of September 22, 2006 the sum of $121,702.80 is due and owing under the Master Lease Agreement which includes $47,624.99 in unpaid rent and expenses, $5,717.00 in late charges, and $68,362.82 in total future rent discounted to present value at 5.5%. Additionally, under the terms of the Agreement interest continues to accrue on any amounts defendant may owe to plaintiff at a rate of 1.5% per month.

### MEMORANDUM

Plaintiff asserts the Master Lease Agreement and associated Equipment Schedules constitute a finance lease under Article 2A of the Uniform Commercial Code which renders defendant's obligation to submit payments irrevocable. Alternatively, plaintiff asserts even if the Agreement fails to qualify as a finance lease under Article 2A, language contained within the Master Lease Agreement has the same effect as the statute which likewise renders defendant's obligation to submit payments irrevocable. Accordingly, plaintiff argues its motion for summary judgment should be granted because defendant has failed to submit its monthly payments in accordance with the terms of the Master Lease Agreement.

Defendant asserts the Master Lease Agreement and associated Equipment Schedules constitute a contract for the sale of goods with a security interest which is governed by Article 2 of the Uniform Commercial Code rather than by Article 2A. Additionally, defendant asserts it had the right to revoke its acceptance of the nonconforming equipment under § 2–608 of the Uniform Commercial Code notwithstanding any contrary provisions contained

within the Agreement. However, defendant asserts genuine issues of material fact remain concerning whether it effectively revoked its acceptance of the subject equipment under § 2–608. Accordingly, defendant argues its motion for partial summary judgment should be granted and plaintiff's motion should be denied.

Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

A fact is material only if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Disputes over unnecessary or irrelevant facts will not preclude summary judgment. *Id.* Further, a factual issue is genuine only if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. *Id.* A court's role in summary judgment is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2511.

To determine whether there is a genuine issue of material fact for trial courts construe all facts in the light most favorable to the non-moving party. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir.2003) (citation omitted). Additionally, a court draws all reasonable inferences in favor of that party. *Id.* However, the non-movant must set forth "specific facts showing that there is a genuine issue for trial" which requires more than "just speculation or conclusory statements." *Id.* at 283 (citations omitted). If a court determines that the material

3. The Master Lease Agreement contains a choice of law provision providing that each lease is governed by the laws of the State of

facts are not in dispute then the "sole question is whether the moving party is entitled to judgment as a matter of law." *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir.1997) (citation omitted).

■ The *"lease v. security interest"* issue is one of the most frequently litigated issues under the entire Uniform Commercial Code. White, James & Robert Summers, *Uniform Commercial Code*, § 30–3 (4th ed.1995). Under Utah law, when a transaction purports on its face to be a lease, "but is in fact a sale with reservation of a security interest ... it becomes subject to the law of sales."[3] *Centurian Corp. v. A.L. Cripps*, 624 P.2d 706, 709 (1981). Whether a lease is intended as security is to be determined by the facts of each action. *Id.* (citation omitted). However, language contained within the Uniform Commercial Code as adopted by the State of Utah resolves the issue in this action.

Under Utah law, a Lease is defined as "a transfer of the right to possession and use of goods for a term, in return for consideration...." Utah Code Ann. § 70A–2a–103(1)(j). However, a sale "including a sale on approval or a sale or return, or retention or creation of a security interest is not a lease." *Id.* Additionally, a Finance lease is specifically defined under Utah law as follows:

(g) 'Finance lease' means a lease in which:

(i) the lessor does not select, manufacture, or supply the goods;

(ii) the lessor acquires the goods or the right to possession and use of the goods in connection with the lease; and

(iii) one of the following occurs:

Utah. Accordingly, the parties agree that Utah law governs this action.

(A) the lessee receives a copy of the contract by which the lessor acquired the goods or the right to possession and use of the goods before signing the lease contract;

(B) the lessee's approval of the contract by which the lessor acquired the goods or the right to possession and use of the goods is a condition to effectiveness of the lease contract;

(C) the lessee, before signing the lease contract, receives an accurate and complete statement designating the promises and warranties and any disclaimers of warranties, limitations, or modifications of remedies, or liquidated damages, including those of a third party, such as the manufacturer of the goods, provided to the lessor by the person supplying the goods in connection with or as a part of the contract by which the lessor acquired the goods or the right to possession and use of the goods; or

(D) if the lease is not a consumer lease, the lessor, before the lessee signs the lease contract, informs the lessee in writing:

(I) of the identity of the person supplying the goods to the lessor, unless the lessee has selected that person and directed the lessor to acquire the goods or the right to possession and use of the goods from that person;

(II) that the lessee is entitled under this chapter to the promises and warranties, including those of any third party, provided to the lessor by the person supplying the goods in connection with or as part of the contract by which the lessor acquired the goods or the right to possession and use of the goods; and

(III) that the lessee may communicate with the person supplying the goods to the lessor and receive an accurate and complete statement of those promises and warranties, including any disclaimers and limitations of them or of remedies.

Utah Code Ann. § 70A–2a–103(1)(g). However, under Utah law a Security interest is defined as "an interest in personal property or fixtures which secures payment or performance of an obligation." Utah Code Ann. § 70A–1–201 (37)(a).

Additionally, under Utah law a transaction creates a security interest "if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and:"

(i) the original term of the lease is equal to or greater than the remaining economic life of the goods;

(ii) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;

(iii) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement; or

(iv) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

Utah Code Ann. § 70A–1–201(37)(b).

■ The distinction between a true finance lease and a sale of goods with a security interest is important because with a finance lease "the lessee's promises under the lease contract become irrevocable and independent upon the lessee's acceptance of the goods." Utah Code Ann. § 70A–2a–407(1). Additionally, the lessee's irrevocable and independent promise "is not subject to cancellation, termination,

modification, repudiation, excuse, or substitution without the consent of the party to whom the promise runs." Utah Code Ann. § 70A–2a–407(2)(b). However, if the transaction constitutes a sale of goods with a security interest "[t]he buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it"

(a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

(b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

Utah Code Ann. § 70A–2–608(1). Additionally, where a buyer "rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract ... the buyer may cancel ..." Utah Code Ann. § 70A–2–711 (1). Accordingly, the ultimate distinction is important because classification of the transaction affects the rights of the parties. The undisputed facts of this action establish that while the Master Lease Agreement (and associated Equipment Schedules) purports on its face to be a lease it is in fact a sale with reservation of a security interest.

The agreement itself is entitled Master Lease Agreement and plaintiff is consistently referred to throughout as Lessor while defendant is consistently referred to as Lessee. Additionally, the Master Lease Agreement contains a provision explicitly stating that the transaction is intended to be a finance lease. Said provision reads in relevant part as follows:

UCC Filings. Lessee [defendant] acknowledges that this Lease is intended to be a "finance lease" as defined in § 2A–103(1)(g) of the Uniform Commercial Code, as in effect in Utah ("UCC").

Further, the Agreement satisfies Utah's definition of finance lease in as much as: (1) plaintiff did not select, manufacture, or supply the goods, (2) plaintiff acquired the goods in connection with the Agreement; and (3) before defendant signed the Agreement it: (a) selected Global as the supplier and directed plaintiff to acquire the goods from Global, (b) was aware that it was entitled to the promises and warranties provided to plaintiff by Global; and (c) was aware that it could communicate with Global. Accordingly, at first glance it appears that the Agreement is in fact a finance lease.

However, the Equipment Schedules to the Master Lease Agreement each contain a provision entitled "Purchase Obligation" which provides as follows:

Lessee [defendant] irrevocably and unconditionally agrees to purchase all (but not less than all) of the Equipment, "AS IS," "WHERE IS," without representation or warranty of any kind from Lessor, [plaintiff] for the Purchase Amount shown above ... upon the expiration of the Initial Term of this Schedule.

It is undisputed that defendant was not permitted to terminate its monthly payment obligation under the terms of the Master Lease Agreement and associated Equipment Schedules. Accordingly, the consideration defendant was to pay plaintiff for the right to possession and use of the goods was "an obligation for the term of the lease not subject to termination by [defendant.]" Utah Code Ann. § 70A–1–201(37)(b). Additionally, the "Purchase Obligation" provision enumerated above establishes that defendant was "bound to become the owner of the goods." *Id.* As such, under Utah law the transaction by definition created a security interest.

However, this determination does not end the Court's analysis because it does not necessarily follow that classifying the transaction as a security interest entitles defendant to escape its payment obligation. In its brief, defendant asserts the equipment "that is the subject of the [c]ontracts is nonconforming because, since May 2005, the Global Messaging Units do not send or receive messages." (Def.'s Br. Opp'n Pl.'s Mot. Summ. J. at page 18). Additionally, defendant asserts the "nonconformity of the equipment did not occur until after it had been accepted ..." Id. at 25. Accordingly, defendant argues it is entitled to both revoke its acceptance of the nonconforming equipment under § 2–608 and cancel the contract under § 2–711(1) rendering invalid the Obligations Absolute provision of the Agreement.

■ However, there is no evidence that the subject equipment itself is nonconforming. Rather, the undisputed facts clearly establish that what is in fact nonconforming is the service Global provided to defendant which was access to FM frequencies and under Utah law, "[c]hapter two of the Uniform Commercial Code" does not apply to services. *Beehive Brick Co. v. Robinson Brick Co.*, 780 P.2d 827, 832 (Utah Ct.App.1989) (citations omitted).

In February of 2005, defendant immediately contacted Global (not plaintiff) when ten percent of its messages failed to reach their destination. At that time, Mr. Hildebrand was informed that Global was having technical problems with the FM service in certain areas. However, there is no evidence that Mr. Hildebrand was likewise informed of any equipment failure. Additionally, in March of 2005 Mr. Hildebrand was in continuous contact with Global (not plaintiff) when twenty to thirty percent of defendant's messages were lost in transit. At that time, Mr. Hildebrand was informed that the technical problems would be corrected soon. However, there

is again no evidence that Mr. Hildebrand was likewise informed of any equipment failure. Finally, defendant's attorney's own letter of June 22, 2005 expressly provides that "the essential communication services were not being provided." Accordingly, the only evidence of nonconformity submitted to the Court concerns the nonconformity of service provided by Global rather than the nonconformity of equipment provided by plaintiff. As such, defendant had no basis to either revoke its acceptance of the equipment under § 2–608 or cancel the Agreement under § 2–711(1).

Defendant argues that under Utah Code Ann. § 70A–2–719(1)(a) it cannot be contractually deprived of the right to revoke its acceptance of the equipment where no alternative remedy is provided by the contract. As such, defendant argues that the Obligations Absolute provision cannot be enforced because it would then be deprived of all remedies under the Agreement. Utah Code. Ann. § 70A–2–719(1)(a) provides in relevant part as follows:

> ... the agreement may provide for remedies in addition to or in substitution for those provided in this chapter and **may limit or alter the measure of damages recoverable under this chapter,** as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts ...

*Id.* (emphasis added). Accordingly, said statute expressly provides that parties to an agreement may limit the measure of damages recoverable by a buyer. The parties involved in this action have done just that. The Disclaimer provision of the Master Lease Agreement provides in relevant part as follows:

> ... So long as Lessee is not in default under the Lease, Lessee is entitled to any and all warranties provided to Les-

sor by or through Supplier or the manufacturer, and may communicate with Supplier and the manufacturer, and receive those warranties. So long as Lessee is not in default under the Lease, Lessor assigns such warranties to Lessee for the duration of the Lease Term. Lessee agrees to look only to Supplier or the manufacturer for any defect or breach of warranty regarding the Equipment. . . .

Accordingly, the Master Lease Agreement expressly provides a remedy to defendant for nonconforming equipment. Said Agreement provides that in the event the Equipment becomes nonconforming defendant can look to Global as the Supplier for any defect or breach of warranty claim. As such, defendant is not contractually deprived of all remedies as it contends. Rather, it can maintain a cause of action for breach of warranty against Global. While this may not be the remedy defendant prefers, it is the one it contractually agreed to and under the rules of contract interpretation the parties intent "is to be ascertained from the content of the instrument itself." *Plateau Mining Co. v. Utah Div. of State Lands and Forestry,* 802 P.2d 720, 725 (1990) (citations omitted). Accordingly, there is no reason to judicially revise the Master Lease Agreement when a remedy remains available to defendant.

The undisputed facts of this action establish that the Master Lease Agreement (and associated Equipment Schedules) constitute a sale of goods with a security interest. Accordingly, defendant is entitled to partial summary judgment on this limited issue as a matter of law. However, plaintiff is entitled to summary judgment on its breach of contract claim because the undisputed facts of this action establish that the subject equipment itself is not nonconforming. Accordingly, defendant

had no basis to either revoke its acceptance of the equipment under § 2–608 or cancel the Agreement under § 2–711(1).

## ORDER

IT IS ORDERED that plaintiff Key Equipment Finance Inc.'s motion for summary judgment is GRANTED as it concerns count two of its complaint and in all other respects is DENIED.

IT IS FURTHER ORDERED that defendant Pioneer Transportation, Ltd.'s motion for summary judgment is GRANTED in as much as it seeks an order declaring that the Master Lease Agreement constitutes a sale of goods with a security interest rather than a finance lease and in all other respects is DENIED.

IT IS FURTHER ORDERED that judgment is entered in favor of plaintiff against defendant on its breach of contract claim in the amount of $121,702.80 plus interest at the rate of 1.5% per month from the date of September 22, 2006 and costs.

IT IS FURTHER ORDERED that judgment is entered in favor of defendant against plaintiff on its claim under Article 2A of the Uniform Commercial Code dismissing said claim with prejudice and costs.