**LMV LEASING, INC., Plaintiff and Appellee,**

v.

**Val CONLIN, Barbara Conlin, Tubber T. Okuda, Mary Y. Okuda, and Roy W. Mallory, Defendants and Appellants.**

No. 890504–CA.

Court of Appeals of Utah.

Jan. 16, 1991.

Val J. Conlin and Barbara Conlin (argued), Henderson, Nev., pro se.

Steven W. Call (argued), Weston L. Harris, Paul A. Hoffman, Watkiss & Saperstein, Salt Lake City, for plaintiff and appellee.

Before BENCH, BILLINGS and GARFF, JJ.

## OPINION

BENCH, Judge:

Val and Barbara Conlin appeal from the trial court's decision finding them liable as guarantors for amounts owed to LMV Leasing, Inc. (LMV) by M.C.O., Inc. (MCO). Because MCO, as principal obligor under an agreement between it and LMV, defaulted in its obligations, LMV sued the Conlins and other individual guarantors to recover amounts owed it under the agreement. The trial court granted LMV's motion for partial summary judgment as to the liability of the individual guarantors and ultimately entered final judgment for LMV. The Conlins appeal both the trial court's decision to grant LMV's partial summary judgment motion and its final judgment. We affirm.

### I. FACTS

On December 29, 1986, LMV entered into a contract with MCO, a Utah corporation doing business as American International Rent–A–Car. The contract was entitled "PREFERRED VEHICLE LEASE AGREEMENT" and anticipated a series of transactions by which LMV would provide MCO with automobiles for use in MCO's car rental business. The agreement named LMV as lessor and MCO as lessee. According to its provisions, LMV, as lessor, retained all "right, title or interest" in the automobiles except for MCO's right to use the vehicles in accordance with the agreement.

The terms of the agreement did not give MCO an option to purchase the vehicles after the termination of the lease agreement, and neither party has alleged the existence of any oral provision to grant such an option to MCO. Under the agreement, the lease for each vehicle terminated either upon default by MCO or at the conclusion of the base lease term. MCO was obligated to return the vehicles to LMV after termination. When MCO returned the vehicles, LMV was to sell the vehicles at wholesale in a commercially reasonable manner. After sale of the vehicles, MCO was entitled to any surplus funds received

from the sale after the "book value"[1] of the cars was deducted from the net selling price. Similarly, MCO was obligated to pay LMV for any deficiency resulting after the book value of the sold vehicle was subtracted from the net selling price.

The contract established a lease term of forty-eight months which could be terminated at MCO's discretion subject only to the requirement of a twelve month minimum lease term. The agreement specified that MCO could not extend the lease term for any vehicle beyond the initial forty-eight months and that all tax benefits from ownership of the vehicles was reserved to LMV. Rent payments under the lease was the sum of two factors: the Agreed Price of the vehicles divided by the forty-eight month base lease term, and a "financing" amount.[2] The agreement expressly provided that LMV made no warranty regarding the merchantability, fitness, design, or quality of the leased vehicles.

MCO had the sole responsibility for the maintenance and repair of the vehicles, as well as the obligation to pay title, licensing, registration and inspection fees. Liability for property, use, and sales taxes was also assigned to MCO. Additionally, MCO was obligated to obtain property and liability insurance and also agreed to indemnify LMV for any claim arising out of or related to the operation of vehicles rented under the lease. Finally, the agreement included detailed provisions setting forth LMV's remedies in the event of default by MCO, among which was the option to accelerate the entire balance of future rent due.

On January 26, 1987, the Conlins signed an agreement entitled "UNCONDITIONAL AND IRREVOCABLE GUARANTY OF PAYMENT" by which they agreed per-sonally, unconditionally and irrevocably to guarantee the payment of any amounts due LMV from MCO in the event of MCO's default. In addition to the Conlins, three other individuals signed identically worded guaranty agreements.[3]

MCO filed bankruptcy in August, 1987, and failed to make monthly payments as required under the lease agreement after September, 1987. On January 26, 1988, LMV's counsel notified the five guarantors that MCO had incurred an arrearage in its accounts with LMV. None of the guarantors satisfied the indebtedness or made payment that could have been applied to the indebtedness. On approximately March 11, 1988, LMV repossessed the vehicles leased to MCO. Anticipating that the proceeds from the sales of the vehicles would not be sufficient to satisfy the amount owed to it under the contract, LMV filed suit to obtain a deficiency judgment on April 1, 1988. On April 4, 1988, LMV notified MCO and the five individual guarantors that LMV would sell the repossessed vehicles commencing April 13, 1988. The notice of sale explained that the vehicles were to be sold for the highest possible price and that the vehicles were then and would continue to be located at Nate Wade Subaru, a Salt Lake City automobile dealership involved in the retail sale of used vehicles. The notice declared that the vehicles would "be sold in the same manner and fashion as other used vehicles located" at the dealership.

On May 10, 1988, Nate Wade Subaru commenced selling the fourteen vehicles that had been repossessed from MCO, with the last being sold on June 10, 1988. The vehicles were sold in the same manner em-

---

1. "Book value" is defined by the agreement as "the Agreed Price less the aggregate Monthly Depreciation." The Agreed Price is defined as "$100.00 over Dealer Invoice." The Monthly Depreciation is a constant amount calculated at the commencement of the lease by which the Agreed Price is reduced each month. Thus, book value properly may be described as the initial cost of the vehicle adjusted monthly by a constant depreciation factor.

2. Rent payments were actually calculated, however, by adding several factors including the monthly depreciation value of each car, an administration fee, sales tax, and the financing charge. The financing charge was derived by applying an interest rate of two percent over the prime rate as specified by Citibank, New York, to the previous month's book value.

3. All five guarantors were initially named as defendants in LMV's deficiency action. The other guarantors, however, have settled and do not appeal.

ployed by the dealership to sell other used cars on its lot, namely, by private sale.

After filing its complaint, LMV moved for summary judgment on both liability and damages, which motion was denied by the trial court. The court then granted LMV's subsequent motion for partial summary judgment on the issue of liability. Finding no genuine issue as to any material fact regarding the liability of defendants Val Conlin, Barbara Conlin, and the other individual guarantors based on their personal guaranties, the trial court concluded that "LMV leasing is granted judgment against [the guarantors] jointly and severally for any and all amounts owed by MCO, Inc. ... to LMV, which includes any damages LMV may have suffered in this action, pursuant to the Preferred Vehicle Lease Agreement entered into between MCO and LMV on or about December 29, 1986."

When it granted summary judgment as to liability, the trial court requested that the parties submit affidavits as to the amount of damages for which the guarantors were liable to LMV. The guarantors and LMV then submitted affidavits regarding the amount of damages incurred by LMV. The guarantors objected to LMV's affidavit setting forth attorney fees, arguing that the affidavit failed to comply with Rule 4–505(1) of the Utah Code of Judicial Administration. The trial court denied the motion to strike the affidavit and entered judgment against the Conlins and the other defendant-guarantors, jointly and severally, in the amount of $50,500, which included $13,500 in attorney fees.

On appeal, the Conlins claim the trial court erred in granting summary judgment because there were disputed factual issues as to (1) whether the Preferred Vehicle Lease Agreement was, in fact, a true lease or was a security agreement subject to the Utah Uniform Commercial Code ("UUCC"); (2) whether the sale of the repossessed collateral was executed in a commercially reasonable manner *as required by the UUCC;* (3) whether the sale of the repossessed vehicles was executed in a commercially reasonable manner *as required by*

*the contract;* (4) whether LMV was barred from seeking recovery because it impaired the collateral prior to disposal; and (5) the amount of damages and LMV's failure to mitigate damages. The Conlins also contend the trial court erred in (a) assessing the amount of damages by directing the parties to submit affidavits and memoranda rather than by conducting a trial on the issue; and (b) awarding attorney fees when LMV's affidavit failed to comply with the requirements of Rule 4–505(1) of the Utah Code of Judicial Administration.

## II. STANDARD OF REVIEW

A trial court may render summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Utah State Coalition of Senior Citizens v. Utah Power & Light,* 776 P.2d 632, 634 (Utah 1989); *Territorial Sav. & Loan Ass'n v. Baird,* 781 P.2d 452, 456 (Utah Ct.App.1989); Utah R.Civ.P. 56(c). On review of a trial court's grant of summary judgment, we view the facts presented and the inferences fairly arising therefrom in a light most favorable to the nonmoving party. *Geneva Pipe Co. v. S & H Ins. Co.,* 714 P.2d 648, 649 (Utah 1986). In determining whether the undisputed facts of a case entitle the movant to judgment as a matter of law, this court gives no deference to the trial court's conclusions of law, which are reviewed for correctness. *Blue Cross & Blue Shield v. State,* 779 P.2d 634, 636 (Utah 1989); *see also Bonham v. Morgan,* 788 P.2d 497, 499 (Utah 1989) (summary judgment is, by definition, a conclusion of law that is accorded no deference by appellate courts); *Daniels v. Deseret Fed. Sav. & Loan Ass'n,* 771 P.2d 1100 (Utah Ct.App.1989).

Likewise, the interpretation of an unambiguous contract is a question of law which does not require any particular deference to the trial court's interpretation of the contract. *Village Inn Apartments v. State Farm Fire and Casualty Co.,* 790 P.2d 581, 582 (Utah Ct.App.1990). We similarly view the determination of whether an agreement is a lease or a secured sales

agreement as a question of law when our analysis is based upon the language of the agreement itself and not upon extrinsic evidence. *Kimball v. Campbell,* 699 P.2d 714, 716 (Utah 1985).

## III. LEGAL NATURE OF AGREEMENT

■ The Conlins claim that the trial court erred in failing to characterize the agreement as a security agreement rather than a lease. By arguing that the agreement was a security agreement, the Conlins seek to bring the agreement within the coverage of the UUCC. Specifically, the Conlins argue that, under the UUCC, LMV was obligated to dispose of the repossessed vehicles in a commercially reasonable manner and any failure to do so bars LMV's deficiency action.

LMV counters this argument by asserting that whether the agreement was a true lease or a security agreement is irrelevant because a commercially reasonable disposition of the repossessed vehicles was required under both the UUCC and the terms of the agreement.

LMV apparently assumes that commercial reasonableness was relevant only at the damages phase of the dispute and therefore whether the agreement was properly characterized as a true lease or a security agreement was irrelevant to the partial summary judgment. LMV's analysis fails to address the crucial issue in this case. As is illustrated below, determining liability for breach of a lease agreement differs dramatically from determining liability for breach of a security agreement under the UUCC.

■ If the contract is a true lease agreement, fundamental principles of contract law apply to the case, and liability for damages is established merely by showing a breach of the agreement's provisions.[4] Under the provisions of the agreement, failure to dispose of the vehicles in a com-

mercially reasonable manner goes only to the issue of damages. Therefore, if this is a lease, commercial reasonableness would be irrelevant to liability, and the trial court correctly granted LMV's motion for partial summary judgment.

The Conlins argue, however, that if the agreement is a security agreement subject to the UUCC, LMV's deficiency action would have been barred unless it disposed of the repossessed vehicles in a commercially reasonable manner. Accordingly, the Conlins argue that the commercial reasonableness of the disposition of the collateral was a prerequisite to bringing a deficiency action, and that if there is a factual dispute about commercial reasonableness, summary judgment on liability was erroneously granted.

The Conlins are correct in their assertion that contracts properly characterized as security agreements are subject to the UUCC's requirement that collateral be disposed of in a commercially reasonable manner. Utah Code Ann. § 70A-9-504(3) (1990) contains the UUCC's requirement governing the disposal of collateral by a secured party and provides:

> Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but *every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.*

(Emphasis added).

Generally, a secured party's failure to dispose of collateral in a commercially reasonable manner precludes that party from maintaining a deficiency action. *Haggis Management, Inc. v. Turtle Management, Inc.,* 745 P.2d 442, 444 (Utah 1985); *Pioneer Dodge Center, Inc. v. Glaubensklee,* 649 P.2d 28, 31 (Utah 1982); *FMA Fin. Corp. v. Pro-Printers,* 590 P.2d 803, 807-08 (Utah 1979).[5] Thus, if the agreement in

---

4. Neither party disputes the fact that MCO defaulted in its obligations to pay monthly "rental payments" to LMV. If the contract is a true lease, this undisputed fact would justify the trial

court's entry of partial summary judgment on the liability issue.

5. There is some question as to the continued validity of the rule that a creditor cannot recov-

the present case is a security agreement, the question of commercial reasonableness would have been relevant to the trial court's finding of liability for any subsequent deficiency. Therefore, the threshold question in our analysis of this case is whether the agreement entered into by the parties was, in fact, a true lease agreement or a security sales agreement subject to the requirements of the UUCC. Because in granting LMV's motion for partial summary judgment, the trial court did not clearly state its conclusion as to the nature of the agreement, we must now determine its true nature.

In this case, the language used by the parties repeatedly manifested their intent that the agreement was a lease. The agreement was entitled "Preferred Vehicle Lease Agreement." LMV was referred to as lessor; MCO was denominated lessee. Payments made under the agreement were called rent payments. The language of the agreement, i.e., the form of the agreement, would therefore support the conclusion that this was a lease. This is not the end of our inquiry however, we next look at the purpose of the agreement, i.e., its function.

■ In determining the nature of an agreement purporting to be a true lease, courts must look behind the form of an agreement to determine whether it is, in fact, a sales agreement with a reservation of a security interest in the vendor. *See,*

e.g., *Centurian Corp. v. Cripps*, 624 P.2d 706, 709 (Utah 1981) (if transaction purports on its face to be lease but is, in fact, a security agreement, it is subject to the law of sales). However, when the interpreting court finds no dispositive evidence that the parties intended the agreement to be other than what it purports to be by its unambiguous terms, that court should decline to construe the agreement contrary to those terms. As this court has previously observed, "Where questions arise in the interpretation of an agreement, the first source of inquiry is within the document itself. It should be looked at in its entirety and in accordance with its purpose. All of its parts should be given effect insofar as that is possible." *Big Cottonwood Tanner Ditch Co. v. Salt Lake City*, 740 P.2d 1357, 1359 (Utah Ct.App.1987).

The starting point in determining whether an agreement is a true lease or a security agreement disguised as a lease is to apply the definitional provisions of the UUCC. The UUCC applies to "any transaction (regardless of its form) which is intended to create a security interest in personal property." Utah Code Ann. § 70A–9–102(1)(a) (1981). The UUCC defined "security interest" at the time of this agreement as follows:

"Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation. ... Unless a lease or consign-

---

er a deficiency when the creditor has failed to dispose of collateral in a commercially reasonable manner. In *Cottam v. Heppner,* 777 P.2d 468, (Utah 1989), the Utah Supreme Court affirmed a trial court's determination that the secured party had disposed of collateral in a commercially reasonable manner. Accordingly, the court did not address the question whether commercially unreasonable disposition would have barred a deficiency action. Justice Zimmerman suggested, however, that "[t]he consequences of a creditor's failure to comply fully with the [commercial reasonableness] requirements of section 70A–9–504(3) have not been definitively settled in Utah." *Id.* at 474 n. 4. Noting that there are three divergent lines of cases addressing the possible effects of a creditor's failure to appropriately dispose of collateral, Justice Zimmerman suggested that Utah courts have taken each of the three positions and therefore concluded that "[t]his is a question that remains open in Utah." *Id.*

In *Chrysler Dodge Country, U.S.A., Inc. v. Curley,* 782 P.2d 536 (Utah Ct.App.1989) this court affirmed a trial court's determination that the sale of a truck which secured a note was commercially reasonable. *Id.* at 542. This court, in a footnote, explained that because the disposition of the collateral involved in that case was commercially reasonable, the court would not reach the question whether a failure to dispose of collateral in a commercially reasonable manner would have barred a deficiency judgment. *Id.* at 539 n. 4. However, the court referred to Justice Zimmerman's footnote in *Cottam* and acknowledged that the question might still be unresolved. *Id.*

In the present case, because we conclude that the agreement between LMV and MCO was a true lease and not a security agreement, it is likewise not necessary to determine whether a secured party's failure to dispose of collateral in a commercially reasonable manner absolutely precludes a deficiency action under the UUCC.

ment *is intended as security*, reservation of title thereunder is not a "security interest".... Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

Utah Code Ann. § 70A–1–201(37) (1980) (emphasis added) (amended 1990).

Under this statute, for a contract to be characterized as a security agreement, under the UUCC, the parties to the agreement must so intend, and that intent is determined according to the facts of each case.

The only objective characteristic identified by the above-quoted statute as affecting the determination whether an agreement is a true lease or a security agreement is the inclusion of a provision transferring ownership upon compliance with the terms of the lease or the inclusion of an option to purchase for no additional consideration, or for only nominal consideration. Mere inclusion of an option does not necessarily constitute a security agreement; the option must be for only nominal consideration or for no additional consideration, in which case it is presumed to be a security agreement. The present agreement contains no option to purchase, and neither party has alleged the existence of parol evidence to the contrary. Therefore, we must discern the intent of the parties as manifested by the remaining terms of the agreement. *G.G.A., Inc. v. Leventis*, 773 P.2d 841, 845 (Utah Ct.App.1989) ("The cardinal rule is to give effect to the intentions of the parties and, if possible, to glean those intentions from the contract itself.").

In *Colonial Leasing Co. v. Larsen Bros. Construction Co.*, 731 P.2d 483 (Utah 1986), the Utah Supreme Court enumerated several relevant factors in determining whether a contract is a true lease or a security agreement:

> Numerous factors bear on determining whether the terms of an agreement show that it was meant to be a lease or a security agreement. Among others, those factors are whether (1) the lessor is a financier, (2) the lessee is required to insure the goods in favor of the lessor, (3) the lessee bears the risk of loss or damage, (4) the lessee is to pay the taxes, repairs, and maintenance, (5) the agreement establishes default provisions governing acceleration and resale, (6) a substantial non-refundable deposit is required, (7) the goods are to be selected from a third party by the lessee, (8) the rental payments were equivalent to the costs of the goods plus interest, (9) the lessor lacks facilities to store or retake the goods, (10) the lease may be discounted with a bank, (11) the warranties usually found in leases are omitted, and (12) the goods or fixtures are impractical to remove.

*Id.* at 487 (citing J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code*, 882–83 (2d ed. 1980)); *see also Centurian Corp. v. Cripps*, 624 P.2d 706, 710 (Utah 1981) (setting forth three tests for determining whether an agreement purporting to be a lease is a purchase and sale agreement with reservation of a security interest).

We note that, in setting forth this list, the supreme court, by its own language, did not purport to assemble an exhaustive list of factors that may be considered in characterizing a contract as a lease or as a security agreement. Nevertheless, this partial list is a useful point of reference for our analysis in this case.

Many of the twelve factors set forth in *Colonial Leasing* are found in the present agreement. MCO was required to provide insurance, and bore the ultimate risk of loss for any uninsured amount. MCO was obligated to pay the taxes as well as the repair and maintenance costs for the leased vehicles. The agreement included default provisions regarding acceleration and resale. The rent payments were roughly

equivalent to the cost of the vehicles plus interest. LMV lacked facilities for storing or retaking the automobiles. Finally, the agreement specifically excluded any of the warranties typically found in leases, i.e., fitness for purpose, merchantability, and quality.

Despite the presence of these several factors, other aspects of the agreement demonstrate the clear intention of the parties that the agreement was nevertheless intended to be a true lease agreement. Most notably, there is no provision, either explicit or implicit, for transfer of ownership of the vehicles to MCO. "The prime essential distinction between a lease and a conditional sale is that in a lease the lessee never *owns* the property." *Ford v. Rollins Protective Serv. Co.*, 171 Ga.App. 882, 322 S.E.2d 62, 64 (1984) (emphasis added). The agreement specifically provides for retention of title in LMV, the lessor, which is the "paramount attribute of a lease." *Carlson v. Tandy Computer Leasing*, 803 F.2d 391, 395 (8th Cir.1986). Moreover, the agreement includes no alternate provision for transfer of ownership such as an option to purchase at nominal or no additional consideration. Nor is there any indication that the lessee would receive the functional equivalent of ownership.[6]

Additionally, ownership tax benefits under the lease were reserved exclusively to the lessor, another traditional indication that the parties intended to enter a true lease agreement. *See, e.g., American Standard Credit, Inc. v. National Cement ·Co.*, 643 F.2d 248, 266 (5th Cir.1981) (holding that lessors retention of investment tax credit on purportedly leased property manifested intent of parties to enter true lease agreement); *Colonial Leasing*, 731 P.2d at 487.

Because we conclude that there is no dispositive indication on the face of the document that the parties intended to execute a security agreement, we defer to the language of the unambiguous instrument. *Accord Carlson*, 803 F.2d at 395 (intent of parties expressed by consistent use of "lease language"); *American Standard Credit*, 643 F.2d at 266 (principle of function over form does not authorize the courts to ignore the terms of an agreement altogether).

We therefore conclude as a matter of law that the contractual agreement between LMV and MCO was a true lease. Because neither party disputes MCO's default in its monthly rent·payment obligations, it follows that the trial court properly granted LMV's motion for partial summary judgment as to the guarantors liability for MCO's deficiency.

## IV. COMMERCIAL REASONABILITY

■ Because we have concluded that the agreement was a true lease, we need not

---

**6.** We do not imply here that the only circumstance in which an agreement purporting to be a lease may be construed as a security agreement is when it includes a purchase option at nominal or no additional consideration. Section 70A–1–201(37) permits a conclusion that an agreement is intended as a security agreement if the lessee receives only the functional equivalent of ownership. Among the functional equivalents which could indicate the intent of the parties to execute a security agreement is when the lease term period is approximately equal to the life of the leased goods. *See, e.g.,* 68 Am.Jur.2d *Secured Transactions* § 120, 963 n. 48 (1973) (noting that ownership is typically demonstrated by a purchase option at a nominal price but that "[i]t is possible that a lease arrangement may also be considered a secured transaction if the lease is for a term equal to the life of the equipment at rentals that would be cumulatively sufficient to pay in full for the price of the equipment"); *see also Centu-rian Corp. v. Cripps*, 624 P.2d at 710 ("a lease agreement is actually a purchase and sale agreement if the 'lease payments' are clearly designed to establish an ownership interest in the 'lessee' ").

In the present agreement, the lease term was forty-eight months and neither party could extend the lease term. Although the lease payments might arguably have equalled the full price of the vehicles after the full lease term, the lessee could unilaterally terminate the lease at any time after twelve months. Therefore MCO was not absolutely obligated to pay the full purchase price of the vehicles, as it would have been under a security sales agreement. Moreover, neither party has argued that the life of the automobiles was limited to the forty-eight month lease term. By the express terms of the agreement, the lessor, not the lessee, would retain the significant post-termination value of the vehicles.

address the Conlins' second claim that the trial court erred in granting summary judgment because there remained a disputed factual issue as to whether LMV disposed of the collateral in a commercially reasonable manner as required by the UUCC. The UUCC does not control this case inasmuch as we have concluded that the agreement was a true lease.

The Conlins also argue that partial summary judgment should not have been granted because there remained disputed factual issues regarding whether the vehicles were disposed of in a commercially reasonable manner as required by the lease agreement. Section 19 of the agreement sets forth the procedure to be followed by the parties upon termination of the lease agreement for any car: "At the end of the Base Lease Term of any vehicle or upon the termination of the lease ... by Lessor, or upon the exercise by Lessee of its right to retire any vehicle from service ... Lessor will sell it at wholesale in a commercially reasonable manner." Relying on this provision, the Conlins now argue that, even though the agreement is a true lease, LMV, as lessor, was obligated to dispose of the vehicles upon termination of the lease agreement in a commercially reasonable manner.

Even assuming that there remained disputed factual questions about LMV's failure to dispose of the vehicles in a commercially reasonable manner, such questions could not have precluded summary judgment as to liability. Under the provisions of the lease agreement, any failure to dispose of the vehicles in a commercially reasonable manner was not anticipated to be an absolute bar to a suit for any resulting deficiency. Therefore, disputed factual issues relating to such failure were not relevant to determining liability. The motion for partial summary judgment was limited in scope to the issue of liability and because neither party disputes that MCO defaulted in its obligation to pay monthly rental payments, the motion was properly granted by the trial court.

## V. DETERMINATION OF DAMAGES BY AFFIDAVITS AND MEMORANDA

■ The Conlins argue that the trial court erred in determining damages based solely on affidavits and memoranda submitted simultaneously by both parties. The Conlins allege a deprivation of their right to trial as guaranteed by the due process clause of the Utah Constitution. They argue that submission of the damages issue by affidavit and memoranda deprived them of the opportunity to submit evidence to a trier of fact and to cross-examine LMV's witnesses.

We do not reach the merits of this argument because it was not adequately preserved for appeal by a timely objection during the trial proceeding. "[I]t is axiomatic that matters not presented to the trial court may not be raised for the first time on appeal." *Franklin Fin. v. New Empire Dev. Co.*, 659 P.2d 1040, 1044 (Utah 1983); *see also Salt Lake City Corp. v. James Constructors, Inc.*, 761 P.2d 42, 46 (Utah Ct.App.1988). This rule applies even when an appeal involves constitutional issues. *See, e.g., Salt Lake County v. Carlston*, 776 P.2d 653, 655 (Utah Ct.App. 1989) (there is no reason to exempt constitutional claims from application of the rule barring appellate review of claims not raised at trial); *see also, State v. Webb*, 790 P.2d 65, 75–80 (Utah Ct.App.1990) (limited exceptions to the general rule include exceptional circumstances, plain error, and deprivation of liberty interests). We recently reiterated the policy underlying the rule precluding appellate review absent a timely objection:

"If something occurs which the party thinks is wrong and so prejudicial to him that he thereafter cannot have a fair trial, he must make his objection promptly and seek redress by moving for a mistrial, or by having cautionary instructions given, if that is deemed adequate, or be held to waive whatever rights may have existed to do so." Otherwise, "[i]t would be manifestly unjust to permit a party to sit silently by, believing that prejudicial error had been committed"

and then "if he loses, come forward" claiming error.

*Onyeabor v. Pro Roofing, Inc.*, 787 P.2d 525, 527 (Utah App.1990) (quoting *Hill v. Cloward*, 14 Utah 2d 55, 58, 377 P.2d 186, 188 (1962)).

Although we have serious reservations about the procedure employed by the trial court in deciding the damages question, we are unable to find anything in the record indicating a timely objection by the Conlins' trial counsel. As appellants, the Conlins bear the burden of building a trial record adequate to preserve their arguments on appeal. *See Franklin Fin.*, 659 P.2d at 1045. Furthermore, the Conlins have advanced no argument that any of the recognized exceptions to the general rule are present here. Consequently, we decline to reach the merits of the Conlins' argument.

## VI. ATTORNEY FEES

■ The Conlins also assign as error the trial court's denial of their motion to strike LMV's affidavit of attorney fees and the trial court's subsequent entry of judgment for attorney fees in the amount of $13,500. The Conlins argue that LMV's affidavit failed to comply with Rule 4–505(1) of the Utah Code of Judicial Administration in that the affidavit failed to specify the hourly rate charged by the attorneys who worked on the case. Rule 4–505(1) provides:

> Affidavits in support of an award of attorneys' fees must set forth specifically the legal basis for the award, the nature of the work performed by the attorney, the number of hours spent to prosecute the claim to judgment, or the time spent in pursuing the matter to the stage for which attorneys' fees are claimed, and affirm the reasonableness of the fees for comparable legal services, The affidavit must also separately state hours by persons other than attorneys, for time spent, work completed and hourly rate billed.

The Conlins acknowledge the absence in the rule of the requirement that an affidavit of attorney fees specify the hourly rate charged by each attorney working on the case. They rely, however, on two recent decisions of this court, *Talley v. Talley*, 739 P.2d 83 (Utah Ct.App.1987), and *Maughan v. Maughan*, 770 P.2d 156 (Utah Ct.App. 1989), for the proposition that the reasonableness of fees cannot be established absent specification of the hourly rate charged by each attorney.

In *Talley*, this court reversed a trial court's award of attorney fees in a divorce case. In determining the reasonableness of the amount of requested attorney fees, the court suggested that there must be some evidence "regarding the necessity of the number of hours dedicated, the reasonableness of the rate charged in light of the difficulty of the case and the result accomplished, and the rates commonly charged for divorce actions in the community." *Id.* (quoting *Kerr v. Kerr*, 610 P.2d 1380, 1384–85 (Utah 1980)).

In *Maughan*, this court reiterated the standard set forth in *Talley* and affirmed a trial court's award of attorney fees. We deferred to the trial court's judgment regarding the number of attorney hours required to bring the case to judgment. *Id.* There was no discussion, however, regarding the hourly rate of the attorneys.

Nothing in either *Talley* or *Maughan* suggests that the party seeking attorney fees must specify the hourly rate billed by each attorney working on the case in order to fully comply with Rule 4–505(1). So long as the legal basis of the award, the nature of the work performed by the attorneys, the number of hours spent to prosecute the claim, and some affirmation that the fees charged are reasonable in light of comparable legal services are included in the affidavit submitted by the party requesting the fees, there is no failure to comply with Rule 4–505(1). While an hourly rate would likely be helpful to the trial court, we decline to imply a requirement that the hourly rate for each attorney must be specified. It was therefore within the trial court's discretion to accept LMV's affidavit absent the hourly rates of each attorney involved. The trial court's denial of appellant's Motion to Strike the affidavit of

attorney fees submitted by LMV is therefore affirmed.

## VII. CONCLUSION

We have examined the Conlins' remaining assignments of error and have found them to be without merit. Accordingly, we affirm both the trial court's grant of LMV's motion for partial summary judgment and its entry of final judgment.

BILLINGS and GARFF, JJ., concur.