Dale L. LARSON; Grethe Larson; and Systematic Builders, Inc., Plaintiffs and Appellants,

v.

OVERLAND THRIFT AND LOAN; Linda D. Milne; and Western Surety Company, Defendants and Appellees.

No. 900411–CA.

Court of Appeals of Utah.

Oct. 17, 1991.

---

Joseph H. Bottum and David W. Brown, Salt Lake City, for plaintiffs and appellants.

Jeffrey M. Jones, Michael L. Dowdle, and Robert Payne, Salt Lake City, for defendant and appellee Overland Thrift and Loan.

Joseph Dunbeck, Salt Lake City, for defendants and appellees Milne, and Western Sur.

Before BENCH, GREENWOOD and JACKSON, JJ.

## OPINION

BENCH, Presiding Judge:

A deed of trust was recorded on the Larsons' home in favor of Overland Thrift and Loan (Overland) as additional security for the lease financing of industrial equipment. The lease went into default and Overland repossessed the equipment and

initiated foreclosure on the home. The Larsons sued to rescind the trust deed and to enjoin the foreclosure sale. The district court granted summary judgment in favor of the defendants and the Larsons appeal following final certification of judgment under Utah Rules of Civil Procedure 54(b). We affirm in part and reverse in part.

## I. FACTS

On November 27, 1984, a lease financing agreement was entered into between PFC, a lease broker, as lessor; and, Dale L. Larson and Robert J. Lucking, partners in L & L Wire EDM, as lessees, for the five-year lease of industrial equipment. The agreement specifically referred to a home owned by Dale Larson and Grethe Larson as additional security pledged for the leased equipment that had been supplied by Intermountain Machine Tool (Intermountain). In connection with the lease financing agreement, Dale Larson and Robert Lucking also signed an equipment lease guaranty as co-guarantors.

On November 20, 1984, PFC employee Ray Welling delivered to the Larsons a trust deed prepared for their signatures. The trust deed named the Larsons as grantors of the trust deed on their home owned in joint tenancy, and Overland as beneficiary. The trust deed expressly stated it was "being recorded for additional securing [sic] on a lease for Robert J. Lucking & Dale L. Larson dba L & L Wire EDM in the amount of $112,185.92 on lease number 312 401 Dated November 7, 1984." After the trust deed was executed, Linda Milne notarized and recorded it.

The day after the lease financing agreement was signed, PFC formally assigned its interest in the lease to Overland. Monthly lease payments were made until September 2, 1986, when the lease went into default. A flurry of activity then followed. The Larsons gave Systematic Builders a warranty deed on their home on January 21, 1987. Two days later, Overland recorded a Notice of Breach and Election to sell the Larson home and a trustee's sale was set for May 27, 1987. Systematic Builders subsequently recorded its warranty deed on February 5, 1987. Overland repossessed the equipment on February 15, 1987, and sold it for $10,750 over a year later.

In order to save their home from foreclosure, the Larsons filed suit on May 19, 1987, to rescind the trust deed as a consumer credit transaction under 15 U.S.C. § 1635(b), and to enjoin the trustee's sale. Although Dale Larson denied ever signing the trust deed, Grethe Larson admitted responsibility for placing both his and her signatures on the deed and the lease, but claimed she did so because of fraud and coercion. Grethe Larson also alleged the notary Linda Milne was not present when the documents were signed. The district court denied the Larsons' application for a preliminary injunction and the real property was sold to Overland for $51,864.90.

The Larsons requested leave to file an amended complaint and, by August 1, 1988, had filed four more amended complaints due, in large part, to their failure adequately to plead fraud. Counterclaims were filed and, after discovery and depositions, Milne and Western Surety moved for summary judgement. Overland soon followed with two separate motions for partial summary judgment.

The district court granted the motion for summary judgment filed by Milne and Western Surety and dismissed with prejudice the Larsons' fraud claims against the notary and the bond company. The court next granted Overland's motion for partial summary judgment, and dismissed all claims asserted by Systematic Builders. At the same time, the court dismissed the Larsons' claims against Overland for "fraud, duress and so on"; ordered the transfer of Grethe Larson's one-half interest in the Larsons' home to Overland; determined that the "lease" was, as a matter of law, a true lease and not a security agreement; ordered that Dale Larson was fully obligated on the guaranty; entered judgment against Dale Larson on the lease due to his status as a partner in L & L Wire; and, denied the Larsons' claims that enforcement of the lease allowed double recovery and penalty because Overland

only sought to recover amounts due after offset from sale proceeds.

The district court later granted Overland's second motion for partial summary judgment on the remaining counts: that the sale of the equipment by Overland was made in good faith; and, that Dale Larson was liable under the lease for $69,883.80. The court then certified the judgments as final under Utah Rule of Civil Procedure 54(b).

## II. STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *LMV Leasing, Inc. v. Conlin*, 805 P.2d 189, 192 (Utah App.1991). In determining whether the trial court correctly found that there was no genuine issue of material fact, we review the facts and inferences from them in the light most favorable to the losing party. *Ron Case Roofing & Asphalt Paving, Inc. v. Blomquist*, 773 P.2d 1382, 1385 (Utah 1989). We review conclusions of law for correctness and give no deference to the trial court. *Blue Cross & Blue Shield of Utah v. State of Utah*, 779 P.2d 634, 636–37 (Utah 1989).

The interpretation of a contract can present either a question of law, to be determined by the words of the agreement, or a question of fact, to be determined by extrinsic evidence. *Kimball v. Campbell*, 699 P.2d 714, 716 (Utah 1985). Interpretation of an unambiguous contract is a question of law and does not require any deference to the conclusions of the trial court. *LMV Leasing*, 805 P.2d at 192. If the terms of an agreement are clear and unambiguous, we interpret them according to

their plain and ordinary meaning and extrinsic or parol evidence is generally not admissible to explain the intent of the parties. *Faulkner v. Farnsworth*, 665 P.2d 1292, 1293 (Utah 1983); *Valley Bank & Trust Co. v. U.S. Life Title Ins. Co.*, 776 P.2d 933, 936 (Utah App.1989).

Language is ambiguous if the words used to express the intent of the parties are insufficient so that the contract may be understood to reach two or more plausible meanings. *Property Assistance Corp. v. Roberts*, 768 P.2d 976, 977 (Utah App.1989). When a contract is ambiguous because of uncertainty in the meaning of terms, the absence of terms or other facial deficiencies, parol evidence is admissible to explain the intent of the parties. *Faulkner*, 665 P.2d at 1293. Whether an ambiguity exists is a question of law to be decided before parol evidence may be admitted. *Id.* The language of a contract is not necessarily ambiguous merely because a party urges a different meaning that is more in accordance with its own interests. *Village Inn Apartments v. State Farm Fire & Cas. Co.* 790 P.2d 581, 583 (Utah App.1990).

## III. LEGAL NATURE OF THE AGREEMENT

The Larsons cite *Colonial Leasing Co. of New England v. Larsen Bros. Const. Co.*, 731 P.2d 483, 487 (Utah 1986), for the proposition that the character of a transaction, as a lease or a security agreement, "may be" ambiguous when taken as a whole even though specific terms are not.[1] The supreme court identified numerous factors in *Colonial Leasing* that may bear upon whether a lease or a security agreement was intended.[2]

---

1. The Larsons present no argument that words are missing within the terms themselves or that other deficiencies in the contract would have required extrinsic or parol evidence to resolve any uncertainty. We conclude the terms of the contract are clear and unambiguous and may be interpreted in accordance with their plain and ordinary meaning.

2. In *Colonial Leasing*, the supreme court said:
   Numerous factors bear on determining whether the terms of an agreement show that it was meant to be a lease or a security agree-

ment. Among others, those factors are whether (1) the lessor is a financier, (2) the lessee is required to insure the goods in favor of the lessor, (3) the lessee bears the risk of loss or damage, (4) the lessee is to pay the taxes, repairs, and maintenance, (5) the agreement establishes default provisions governing acceleration and resale, (6) a substantial non-refundable deposit is required, (7) the goods are to be selected from a third party by the lessee, (8) the rental payments were equivalent to the costs of the goods plus interest, (9)

In addition to the presence of several lease terms that were identified as factors in *Colonial Leasing,* the Larsons note the existence of an option to purchase the equipment, and the treatment of their home as "additional security" as indications that the parties intended a security agreement. In *LMV Leasing,* 805 P.2d at 196, this court identified ownership (or its functional equivalent) and the means to transfer ownership (such as a purchase option) as a key distinction between a lease and a security agreement.

Under the express language of the lease, however, Dale Larson and Robert Lucking acquired no ownership interest, right or title in the equipment other than a leasehold:

> 9. OWNERSHIP, PERSONAL PROPERTY: Equipment is and shall at all times remain, the property of Lessor; and Lessee shall have no right, title or interest therein or thereto except as expressly set forth in this Lease[.] Equipment is, and shall at all times be and remain, personal property notwithstanding that Equipment or any part thereof may now be, or hereafter become, in any manner affixed or attached to real property or any building thereon.

Dale Larson and Robert Lucking were, however, granted an option to purchase the equipment for fair market value at the end of the lease period:

> 11. OPTION TO PURCHASE: Lessee shall have an option to purchase Equipment at the end of the lease period for FAIR MARKET VALUE at the time plus all obligations remaining due under this Lease. Notice of exercise of this option must be given in writing to Lessor or Lessor's assignee at least thirty (30) days prior to the expiration of the Lease.

> This option shall terminate and be avoid [sic] upon termination of this lease by reason of Lessee's default.

The issue thus presented is whether an option to purchase leased equipment for fair market value is indicative of a lease or a security agreement. On this point, Utah Code Ann. § 70A-1-201(37) (1980), provides:

> Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

Under this statute, the inclusion of an option is not necessarily determinative of the character of an agreement. The critical factor is the economic value of the consideration to be paid for the exercise of an option. The treatment of a lease as a true lease or a security agreement based on the economic value of consideration to be paid was further explained by a 1990 amendment to section 70A-1-201(37).[3] The statute now provides, in pertinent part, as follows:

> (b) Whether a transaction creates a lease or a security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and:
>
> . . . .

---

the lessor lacks facilities to store or retake the goods, (10) the lease may be discounted with a bank, (11) the warranties usually found in leases are omitted, and (12) the goods or fixtures are impractical to remove.
731 P.2d at 487 (citing J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* 882–83 (2d ed. 1980)). *But see* Utah Code Ann. § 70A-1-201(37)(c) (1990) (negating impact of *Colonial Leasing* factors (2), (3), and (4)).

**3.** Retroactive application of Utah Code Ann. § 70A-1-201(37)(b) (1990) to the issue before us is permissible because the amendments merely clarify or amplify the understanding of the former law. *See Department of Social Servs. v. Higgs,* 656 P.2d 998, 1001 (Utah 1982); *Okland Const. Co. v. Industrial Comm'n,* 520 P.2d 208 (Utah 1974).

(iv) the lessee has an option to become the owner of the goods for no additional or nominal additional consideration upon compliance with the lease agreement.

. . . .

(d) For purposes of this subsection:

(i) Additional consideration is not nominal if ... when the option to become the owner of the goods is granted to the lessee the price is stated to be the fair market value of the goods determined at the time the option is to be performed.

Utah Code Ann. § 70A–1–201(37) (1990).

Although a lease with an option to purchase for no additional or nominal additional consideration constitutes a security agreement under subsection (b)(iv), a purchase option at fair market value is not nominal under the definition of additional consideration in (d)(i). Since the purchase option was not nominal and the Larsons have not raised any argument with respect to the economic life of the equipment,[4] we conclude that the lease is a true lease and not a security agreement.

■ Accordingly, we do not address the commercial reasonableness of the sale because the lease is not a security agreement and a commercially reasonable sale was not required under the lease. In addition, we dismiss the claim that failure to dispose of the equipment in a commercially reasonable manner allowed for double recovery and penalty since Overland is entitled to recover amounts due under the lease after offset from sale proceeds.[5]

## IV. FRAUD AND DURESS CLAIMS AGAINST OVERLAND

■ On appeal, the Larsons argue that they were induced to enter into the lease by the fraudulent representations of Overland or its agents and that the question of reasonable reliance raises issues of fact that preclude summary judgment. In support of their argument, the Larsons refer in general to the allegations in the amended pleadings, and the affidavit of Grethe Larson. The Larsons also cite *Christenson v. Commonwealth Land Title Ins. Co.*, 666 P.2d 302, 305 (Utah 1983) (negligent misrepresentation); *Pace v. Parrish*, 122 Utah 141, 247 P.2d 273, 274–75 (Utah 1952) (fraudulent misrepresentation); and, *Conder v. A.L. Williams and Assocs. Inc.*, 739 P.2d 634, 637 (Utah App. 1987) (fraudulent misrepresentation). However, the allegations referred to support both a claim of fraud as well as duress, and much of the confusion in this case stems from the parties' failure to distinguish between the claims of fraud and duress.

Grethe Larson made several allegations in her affidavit and the "Amended Fourth Amended Complaint" that relate to fraud. Grethe Larson alleges that PFC employee Welling brought several unidentified documents to her home on November 20, 1984, to close the deal on the equipment lease. Grethe Larson claims Welling told her about a separate agreement between Intermountain and PFC in favor of Overland to "buy back" the equipment for $35,000 in case of default, and that money from the sale of the equipment would offset the Larsons' total potential liability of $75,000 under the guaranty. Grethe Larson also claimed that Welling said if monthly payments were made and there were no default, the guaranty would be released and the Larson home would not be involved in the transaction for more than a year.

---

**4.** *See* Utah Code Ann. § 70A–1–201(37)(b)(i)–(iii); *LMV Leasing*, 805 P.2d at 196 n. 6.

**5.** The Larsons challenge the award of attorney fees by the trial court as an additional issue on appeal. The issue was not listed in the statement of issues presented for review in their opening brief, but was raised for the first time in their reply brief. Rule 24(c) of the Appellate Rules of Procedure limits answers in a reply brief to new matter in the appellee's brief. The issue of attorney fees was not raised as new matter, either directly or by inference, in appellee's brief. We decline consideration of the argument, therefore, for failure to comply with the briefing requirement of the rules. *See Christensen v. Munns*, 812 P.2d 69, 72 (Utah App.1991); *Koulis v. Standard Oil Co. of Cal.*, 746 P.2d 1182, 1184–85 (Utah App.1987). *See also Demetropoulos v. Vreeken*, 754 P.2d 960, 962 (Utah App.), *cert. denied*, 765 P.2d 1278 (Utah 1988).

Grethe Larson also made allegations that related to duress. Grethe Larson alleged that Welling insisted she sign the documents immediately, and that he held the documents fast to the table with only their signature blanks exposed. Grethe Larson avers Welling told her there was no time to read the documents and prevented her from reading them. Grethe Larson also said she was not told that a trust deed was included among the documents she signed. Grethe Larson said she felt rushed, but in reliance on Welling's representations, signed both her name and her husband's name to the documents without reading them or knowing what they really were. After she executed the documents, Grethe Larson claimed Welling took them with him to be notarized and promised to return that same day with copies. However, Grethe Larson stated she was never given any copies.

Grethe Larson was later deposed and stated, among other things, that Welling actually had handed her the documents, and that she not only had the opportunity, but could have read them if she wanted. She also said Welling never told her she could not read the documents, but that she felt he was in a hurry and, for reasons of her own, chose not to. On the basis of these contradictions in her statements, Overland brought a motion for summary judgment that quoted from portions of the deposition at length. The trial court ruled there was "no evidence" to support the claims of "fraud, duress and so on."

In *Webster v. Sill*, 675 P.2d 1170, 1172–73 (Utah 1983), the supreme court held that when a party takes a clear position in a deposition that is not later modified on cross-examination, he may not raise contradictory statements in his own affidavit as issues of fact unless he can explain the discrepancy. Because of the contradictory statements in her deposition that were not later modified, we affirm the judgment of the trial court on the issue of "duress and so on." However, since Overland's motion for summary judgment addressed only those statements relating to duress, we decline to affirm summary judgment on the fraud claim. Disposition of the duress

claim does not resolve the fraud claim. In addition, Overland proffered no evidence to counter the Larsons' allegations of agency other than a bald assertion that it did not exist.

Accordingly, there was no basis for the trial court to grant summary judgment on the issue of fraud. The trial court erred, therefore, in dismissing the fraud claim against Overland. We reverse and remand the fraud claim for further proceedings.

## V. THE TRUST DEED AS A CONDITIONAL GUARANTY

■ The Larsons argue that the trust deed must be construed as a conditional guaranty that obligates Grethe Larson to answer for the debt of her husband and Robert Lucking, the lessees, but only after Overland first exhausts the security and establishes a deficiency. Failure to exhaust the security, the Larsons claim, releases them from the guaranty and prevents foreclosure. *See, e.g., Carrier Brokers, Inc. v. Spanish Trail*, 751 P.2d 258, 261 (Utah App.1988) (a conditional guaranty is not immediately enforceable upon default, but requires some contingency to happen to fix liability. The creditor may be required by the terms of the guaranty to pursue the debtor first or designated security, or both, and failure to do so releases the guarantor.)

The Larsons' argument on conditional guaranties, however, is not on point. The Larson house was expressly pledged as additional security in the equipment lease and was secured by means of the trust deed. The house is, therefore, subject to foreclosure independent of the guaranty. Inasmuch as Overland could have executed against any and all security pledged, Overland could initiate foreclosure on the house regardless of the nature of the guaranty.

## VI. FRAUD CLAIMS AGAINST MILNE AND WESTERN SURETY

■ The Larsons appeal the dismissal of their claims against Linda Milne, a notary, and Western Surety, the bond company

insuring Milne as a notary, for Milne's false notarization and acknowledgment of the trust deed. The Larsons claim the trust deed was not signed in Milne's presence and that proximate cause is an issue of fact. The Larsons cite *DeCamp v. Allen*, 156 So.2d 661 (Fla.Dist.Ct.App.1963), and *Collins & Sons Fine Jewelry, Inc. v. Carolina Safety Sys., Inc.*, 296 S.C. 219, 371 S.E.2d 539 (App.1988), for the proposition that a notary who improperly authenticates a document that results in detrimental reliance by innocent third persons will be liable for fraud.

Although the facts regarding execution of the documents are in dispute, we are required to adopt the Larsons' version for purposes of this review. In order to prevail against summary judgment, however, the Larsons must prove a causal connection between the notarization and the loss of their home.

An acknowledgment or other proof of execution, such as a notarization, is a prerequisite to recording a deed of trust or other conveyance of real property under Utah Code Ann. § 57–3–1 (1990). Recording protects the beneficiaries of a trust deed against subsequent buyers by imparting notice, but neither recording nor notarization is a necessary condition to enforce a trust deed between parties to a conveyance. Utah Code Ann. § 57–3–2(3) (1990); *Gregerson v. Jensen*, 669 P.2d 396 (Utah 1983); *Horman v. Clark*, 744 P.2d 1014 (Utah App.1987). Accordingly, notarization did not give Overland the right to foreclose inasmuch as Overland could have foreclosed on the home whether or not the trust deed was recorded. The Larsons, therefore, could not prevail on these facts because any improper notarization did not create or alter the legal relationship between the Larsons and Overland.

■ The Larsons offer absolutely no explanation as to how third parties relied on the notarization and how the reliance caused the Larsons to lose their home. Inasmuch as the Larsons could have lost their home without any acknowledgment and they offered no further explanation on how the notarization caused them to lose their home, or any other good faith argument to extend, modify or reverse existing law, we deem the appeal on this issue to be frivolous. Accordingly, we affirm the judgment of the trial court in favor of Milne and Western Surety and grant them single costs and reasonable attorney fees to Milne and Western Surety pursuant to their request under Utah Rule of Appellate Procedure 33.

## VII. CONCLUSION

We conclude that the agreement in this case was a lease and not a security agreement. We conclude that the claim of duress was unsupported. We also conclude that the house was subject to execution, regardless of the nature of the guaranty, because it was expressly pledged as security in the lease. Although we affirm these rulings in favor of Overland, we reverse the summary judgment on the claim of fraud, and remand the case to the trial court for further proceedings on that issue.

We also affirm the judgment of the trial court on the claims against Milne and Western Surety. We award them single costs and reasonable attorney fees as requested under Utah Rule of Appellate Procedure 33, since the Larsons' appeal against these parties is frivolous.

GREENWOOD and JACKSON, JJ., concur.